STATE OF CONNECTICUT *v.* EDWARD CERCONE

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 17-1645

145

Argued May 20—decided July 9, 1963

*Howard R. Steeg,* of Bristol, for the appellant (defendant).

*Robert P. Sneideman,* prosecuting attorney, for the appellee (state).

Jacobs, J. The defendant, a news dealer, was convicted in a trial to the court upon a one-count information charging him with a violation of our anti-obscenity statute (General Statutes § 53-243),[1]

---

[1] The full text of § 53-243 appears in the footnote in *State* v. *Andrews,* 150 Conn. 92, 93.

which makes it unlawful for "[a]ny person . . . [to have] in his possession with intent to sell . . . any book . . . containing obscene, indecent or impure language." Three principal issues are raised on this appeal: (1) whether the condemned publication, "Gang Girls," is obscene within the meaning of the statute; (2) whether the state's proof of scienter by the defendant was sufficiently established; and (3) whether the conduct of the trial court was prejudicial to the rights of the defendant.

Our first inquiry must be: Is "Gang Girls" obscene? The word "obscene" is a relative and subjective term, describing the reaction of the human mind to a certain type of experience. It is an emotive word, conveying a feeling of disgust. A book or pamphlet is usually said to be obscene, not for the opinions which it expresses, but for the way in which they are expressed. The difficulty in giving it a definition is well illustrated by an international conference held in Geneva in the interests of the "Suppression of the Circulation in the Traffic in Obscene Publications," but when the delegates were assembled they discovered they could not agree on the definition of "obscenity," and then, "having triumphantly asserted that they did not know what they were talking about, the members of the conference settled down to their discussion." Chandos, To Deprave and Corrupt, p. 15 (Introd.) (1962).

Modern confusion in the law of obscenity began in 1868 with the celebrated *Hicklin* case *(Regina* v. *Hicklin,* L.R. 3 Q.B. 360), in which Chief Justice Cockburn reversed the decision of the recorder and restored the destruction order of a pamphlet called "The Confessional Unmasked." In the course of his judgment, he laid down a test for obscenity (p. 371), namely, "whether the tendency of the matter charged as obscenity is to deprave and corrupt

those whose minds are open to such immoral influences." The *Hicklin* test soon became embedded in American law (see *Roth* v. *United States,* 354 U.S. 476, 489, n.25) and was even applied less than a decade ago in *State* v. *Becker,* 364 Mo. 1079. Slowly, however, opposition to it developed. "[T]he rule as laid down [in *Regina* v. *Hicklin*]," said Judge Learned Hand in *United States* v. *Kennerley,* 209 Fed. 119, 120, "however consonant it may be with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time, as conveyed by the words 'obscene, lewd or lascivious.'" The major attack came in 1933 in *United States* v. *One Book Called "Ulysses,"* 5 F. Sup. 182, aff'd, 72 F.2d 705, in which Judge Woolsey lifted the ban on "Ulysses" and in so doing laid down a new test for obscenity in books. The "partly obscene test for obscenity" was explicitly rejected. The court (72 F.2d 708) emphasized that "the proper test of whether a book is obscene is its dominant effect" and the question in each case is whether a publication has a libidinous effect. In 1957, the United States Supreme Court finally put an end to these tests for obscenity; both, the court declared, are unconstitutional. *Roth* v. *United States,* supra, 489. Mr. Justice Brennan, writing for the majority, held (p. 485) "that obscenity is not within the area of constitutionally protected speech or press" because it is (p. 484) "utterly without redeeming social importance." He further declared (p. 487): "Obscene material is material which deals with sex in a manner appealing to the prurient interest," which he explained in a footnote (p. 487, n.20) was "material having a tendency to excite lustful thoughts." In determining what is obscene in any particular case, "[t]he law will not hold the crowd to the morality of saints and seers"; Cardozo, Paradoxes of Legal Science, p. 37; but rather, a constitutionally

satisfactory test is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Roth* v. *United States,* supra, 489. The test for obscenity the court borrowed from the Model Penal Code and explained (p. 487, n.20): "We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10 (2) (Tent. Draft No. 6, 1957), *viz.:* '. . . A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. . . .' See Comment, *id.,* at 10, and the discussion at page 29 *et seq.*"[2]

Connecticut has adopted the *Roth* test for obscenity. "In defining, in *State* v. *Sul* . . . [146 Conn. 78, 85], what constitutes obscenity under § 53-243, we took our text from the opinion of Mr. Justice Brennan, speaking for a majority of five of the United States Supreme Court, in *Roth* v. *United States,* supra. We held that § 53-243 'contemplates a publication, such as a book or pamphlet, which, considered as a whole, has a predominant appeal to the prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and goes substantially beyond the customary limits of candor in describing or representing such matters.' See

---

[2] "The obscenity provisions of the Model Penal Code best illustrate the Code's preference for an oblique approach to morals offenses, *i.e.*, the effort to express the moral impulses of the community in a penal prohibition that is nevertheless pointed at and limited to something else than sin. In this case the target is not the 'sin of obscenity,' but primarily a disapproved form of economic activity—commercial exploitation of the widespread weakness for titillation by pornography." Schwartz, "Moral Offenses and the Modern Penal Code," 63 Colum. L. Rev. 669, 677; see also Henkin, "Morals and the Constitution: The Sin of Obscenity," 63 Colum. L. Rev. 391.

*Roth* v. *United States,* supra, 487, n.20; Model Penal Code § 251.4 (1). The test is 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.'" *State* v. *Andrews,* 150 Conn. 92, 96. The court went on to say (p. 100): "In our examination of the case law and literature on obscenity, we have found no more specific definition of what can be adjudged obscene than that contained in *Roth* v. *United States,* supra, 487."

"Who, then," asks Chief Justice Baldwin in the *Andrews* case (p. 100), "shall apply . . . [the *Roth* test] to the facts of a particular case?"

The line between expressions unconditionally guaranteed and protected and those which may be legitimately suppressed, regulated or punished is finely drawn. Application of this test will not automatically determine the propriety of all books; courts cannot apply it in all cases with the simplicity in which a chemist employs a reagent. Good and bad are not divided by a hairline. Rather, there stretches between them a penumbral zone through which we must make our way with difficulty. The separation of legitimate from illegitimate expression calls for "sensitive tools." See *Speiser* v. *Randall,* 357 U.S. 513, 525. "Passing then to the merits we must of course be cognizant of the risk run by judges in enforcing obscenity statutes such as this and thus perchance condemning what become classics of our intellectual heritage. Some of the present Justices of the Supreme Court [of the United States] revolt against all this supervision as violative of constitutional precepts." *Grove Press, Inc.* v. *Christenberry,* 276 F.2d 433, 436 (Clark, J., sustaining the mailability of "Lady Chatterley's Lover"). But since our antiobscenity stat-

ute has survived a constitutional attack made upon it in *State* v. *Andrews,* supra, 96, "it remains the duty of those of us who sit in inferior courts to enforce it as best we may."[3] *Grove Press, Inc.* v. *Christenberry,* supra. "In short, the appellate court cannot escape this responsibility by saying that the trier of facts, judge or jury, has labeled the questioned matter obscene and there is some evidence to support such a finding." *State* v. *Andrews,* supra, 100. Chief Justice Baldwin quoted with approval (id., 101) a statement from Mr. Justice Harlan, dissenting in *Roth* (p. 497): "[I]f 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind." "[We] would not want or (if . . . [we] could avoid it) permit this court to become a licensor, a censor, a book burner." *Burke* v. *Kingsley Books, Inc.,* 208 Misc. 150, 161 (N.Y.) (Levy, J.). But we cannot avoid and should not avoid facing up to the tough individual problems which are necessarily involved in obscenity cases. It is not our function to express agreement or disagreement with present community standards; our task is to

---

[3] We are mindful of Judge Frank's stirring and illuminating appendix to his concurring opinion in *Roth* v. *United States,* 237 F.2d 796, 806, especially 822, *"Judges as censors,"* in which he says: "When a prosecution is instituted and a trial begins, much censorship power passes to the trial judge: If he sits without a jury, he must decide whether a book is obscene. . . . How does the judge determine whether a book is obscene?" And again at page 825: "To vest a few fallible men—prosecutors, judges, jurors—with vast powers of literary or artistic censorship, to convert them into what J. S. Mill called a 'moral police,' is to make them despotic arbiters of literary products. If one day they ban mediocre books as obscene, another day they may do likewise to a work of genius. Originality, not too plentiful, should be cherished, not stifled." Our only answer is to repeat the words of Judge Clark: "[I]t remains the duty of those of us who sit in inferior courts to enforce . . . [the statute] as best we may." *Grove Press, Inc.* v. *Christenberry,* 276 F.2d 433, 436.

record the times as we find them—not to emulate King Canute in an effort to turn the tide back. To change standards of morals is the task of home, school and church. "Law accepts as the pattern of its justice the morality of the community it assumes to regulate." Cardozo, Paradoxes of Legal Science, p. 37 (1928).

With these principles in mind, we examine for ourselves whether the book under attack is suppressible within constitutional standards. "Gang Girls" is a paperback book containing 160 pages; it is subdivided into 17 chapters and is priced at 60 cents a copy. On the cover of the book, it is referred to as a "Boudoir Limited Edition 1024." Compare *People* v. *Pesky,* 230 A.D. 200 (N.Y.) ("Hands Around," *"intended for private circulation only"* [italics by the court], held obscene). The publisher's lurid blurb on the back cover in bold, black letters reads: "They came from the slums of depravity—young girls—unwanted, unloved—and they banded together because society was against them. Orgies were common, Lesbianism, just another kick, rape, a child's sport, until one man was able to prove truth—the hard way." The principal female characters are described as: "CHICKEN—sadistic gang leader who got her kicks the weird way . . . SUE—nymphomaniac murderess . . . MONA—robber and part-time street walker." The chapters are replete with coarse and vulgar scenes; the plot (if any) is cheap and tawdry. The basic structure or organization of the book remains constant throughout. It is so designed as to act upon the reader as erotic psychological stimuli (verbally aphrodisiac).

We may pause here and examine the process of judicial censorship in operation; we have chosen for demonstration D. H. Lawrence's "Lady Chatterley's

Lover,"[4] which has been described as "polemic against three things which Lawrence hated: the crass industrialization of the English Midlands, the British caste system, and inhibited sex relations between man and woman." *Grove Press, Inc.* v. *Christenberry,* 276 F.2d 433, 437. Lady Chatterley's choice was not strictly speaking between two men but rather between two opposing ways of life: her husband's over-intellectualized, economically secure, respectable, but unfeeling, desexualized existence which feeds itself on self-pity and mental cruelty; and, on the other hand, her husband's gamekeeper, Mellor, with his virile, natural primitivism, which brings him and anyone near him into immediate conflict with the established social order. The choice between such frightening alternatives is not an easy one for Lady Chatterley. Lawrence describes her internal conflict in a psychologically credible and consistent way which is certainly as realistic as the highly erotic passages in the novel. Lawrence preaches a heterodox morality, but whether it can be considered sensually stimulating is at least open to question. Thus, the book might well go uncensored—regardless of its merits—because of the sheer unlikeliness, owing to its style and total content, that anyone would want to read it for the sake of erotic stimulation, or be gratified if he does. But quite to the contrary, "Gang Girls" does not even for a moment distract one with nonerotic descriptions of scenery, character, psychological analyses or philosophical excursions. Its characteristic feature is the progressive buildup in chapter after

---

[4] Of "Lady Chatterley's Lover," the Tokyo High Court (December 10, 1952) said: "[H]owever, there can be a case in which the artistic character of literature attenuates and sublimates sexual impulse created by the sexual description in certain passages, or in which the persuasive of the philosophy or the idea of literature, does away with the character of obscenity." See Norman St. John-Stevas, Obscenity and the Law, p. 255 (1956).

chapter of erotic excitement until the story cul-
minates in a description of the most perverted sen-
sual episode. The point is that there is an over-
whelming concentration and succession of erotic
scenes. The "hero's" amatory revels leave nothing
to the reader's imagination. The objectionable por-
tions of the book are not isolated phenomena. They
set the tone and pattern of the whole book. It is
scatological from start to finish. Having made an
independent appraisal of the challenged book, we
conclude that "Gang Girls" is obscene within the
purview of the statute, applying the *Roth-Sul-
Andrews* test,[5] because, in our opinion, it falls be-
yond the outer limits of tolerance for literary ex-
pression.

The defendant next contends that the proof fails
to establish scienter, that is, "knowledge by . . .
[defendant] of the contents of the book." *Smith* v.
*California,* 361 U.S. 147, 149. "Eyewitness testi-
mony of a bookseller's perusal of a book hardly
need be a necessary element in proving his aware-
ness of its contents. The circumstances may war-
rant the inference that he was aware of what a book
contained, despite his denial." Id., 154, quoted with
approval in *State* v. *Andrews,* 150 Conn. 93, 103.
In January, 1963, the defendant conducted a news
store in the city of Bristol where he sold maga-
zines, newspapers, cigarettes, etc. On January 29,
1963, a state trooper went to the defendant's place
of business, where he was waited on by a young
employee of the defendant. He purchased a copy
of "Gang Girls" in addition to two other unnamed

---

[5] The trial court in its finding and counsel on oral argument appar-
ently relied upon a statement in *State* v. *Andrews,* 24 Conn. L.J.,
No. 3, pp. 8, 11: "We believe, on the basis of the legislative intent
expressed in these statutes, that a 'variable obscenity' concept should
be applied." By an amendment to its opinion, the Supreme Court of
Errors deleted the quoted statement. See *State* v. *Andrews,* 150
Conn. 92, 100.

books. These were located "on the left side" of the top shelf, separate and apart from other books. The supplier of the condemned book was the L. & N. Distributors, an old hand in the distribution of this type of literature and with whose background the defendant was all too familiar.[6] On January 30, 1963, at about 1 p.m., the defendant observed state troopers making a check of books at the Maple End Shoppe, another establishment in Bristol owned by the defendant. He immediately called his employee and instructed him to remove those books which "looked suggestive or sexy cover-wise" but did not specifically mention "Gang Girls." "Gang Girls," along with other books was subsequently found in the basement under the defendant's store. "Obviously the Court is not holding that a bookseller must familiarize himself with the contents of every book in his shop. No less obviously, the Court does not hold that a bookseller who insulates himself against knowledge about an offending book is thereby free to maintain an emporium for smut. How much or how little awareness that a book may be found to be obscene suffices to establish scienter, or what kind of evidence may satisfy the how much or the how little, the Court leaves for another day." *Smith* v. *California,* supra, 161 (Frankfurter, J., concurring). A bookseller may not shut his eyes to something which he should see, nor shut his mind to something which he should know. "A bookseller may, of course, be well aware of the nature of a book and its appeal without having opened its cover, or, in any sense, having knowledge of the book." Id., 164. We hold that all the circumstances disclosed

---

[6] The paragraphs of the court's finding are not separately numbered. See Practice Book, Cir. Ct. Rule 7.22.1 and Form No. 594(1). However, so far as we can determine from the record, this statement is supported by paragraphs 27, 28 and 29 (as numbered by us), which the defendant did not challenge in his "Motion to Correct Finding."

by this case, when taken together, warranted the trial court's conclusion that scienter on the part of the defendant was sufficiently established.

A final claim of error pressed by the defendant is "a predisposition, bias or prejudice [on the part of the court] . . . against the defendant . . . by permitting . . . [the court's] picture . . . to appear on the first page of the Bristol Press . . . one week after this action was tried . . . and before the decision was announced." The record shows that the trial of this case was held in Bristol on February 13, 1963. At the conclusion of the trial, the judge reserved decision and continued the case to February 27. On February 20—one week prior to the announcement of the decision—a photograph was taken in the judge's chambers which appeared on the front page of the Bristol Press on February 21. The caption just under the photograph read: "Battle Obscenity." The following then appears: "The staff of Circuit 17 assisting in the elimination of obscene literature as part of Crime Prevention Week includes left to right: Chief Prosecutor, Robert P. Sneideman; Liaison Officer, David E. McGivney; Neal F. Fitzpatrick, Crime Prevention Week Chairman; Bernard A. Gilman, Bristol Branch of Conn. Citizens for Decent Literature; Captain Edward J. O'Connor, Bristol Police Department and Circuit Court Judge John J. Daly." The photograph and descriptive material as it appeared in the Bristol Press were brought to the attention of the court on February 25. Its impropriety was starkly apparent to the court. On February 26, the court notified counsel for the defendant that it would entertain and grant a motion for mistrial. On February 27, in open court, before announcing its decision, the judge again inquired of counsel whether he desired to take any action or move for mistrial in view of the turn of events. No

motion was made. The defendant elected to proceed. We regard with disfavor "the failure, whether because of mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, the assignment of such errors as grounds of appeal. Such methods amount to trial by ambuscade of the judge." *State* v. *DeGennaro,* 147 Conn. 296, 304, and cases there cited. This was a clear case of gambling on the outcome. See *State* v. *Bailey,* 23 Conn. Sup. 405. The defendant gains nothing by this assignment.

There is no error.

In this opinion PRUYN and KINMONTH, Js., concurred.