STATE OF CONNECTICUT *v.* STEPHEN J. MARTIN ET AL.

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE Nos. CR 2-14187, CR 2-14188

Argued April 5—decided June 11, 1965

*Robert N. Hunziker,* of Bridgeport, for the appellant (defendant Martin's News Service, Inc.).

*George D. Shamiss,* assistant prosecuting attorney, for the appellee (state).

JACOBS, J. The dispositive issue on this appeal is whether the four nudist magazines,[2] taken as a whole, may, under permissible constitutional standards, be deemed to go substantially beyond customary limits of candor, that is to say, whether they are obscene in the statutory sense[3] and therefore not within the protection contained in the first and fourteenth amendments to the federal constitution and in §§ 5 and 6 of article first of the Connecticut constitution. See *Roth* v. *United States,* 354 U.S. 476, 485; *State* v. *Sul,* 146 Conn. 78, 85; *State* v. *Andrews,* 150 Conn. 92, 97. Whether this question is regarded as one of fact or of mixed fact and law, it is settled that it is one for appellate review on the relevant materials. *State* v. *Andrews,* supra, 100; *Jacobellis* v. *Ohio,* 378 U.S. 184, 188.

The four magazines found to be obscene and condemned as a nuisance in the court below are representative nudist magazines. The trial court found

[2] The impugned material consisted of four exhibits: "Urban Nudist," "The Western Nudist," "American Nudist," and "Suntan." These nudist magazines advocate and explain nudism and the nudist mode of living. They contain a substantial but innocuous text.

[3] Under § 53-244a, " 'obscene' means that to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest . . . ." See *State* v. *Andrews,* 150 Conn. 92, 100. We are required to apply a national standard. "We thus reaffirm the position taken in . . . [*Roth* v. *United States,* 354 U.S. 476] to the effect that the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is, after all, a national Constitution we are expounding." *Jacobellis* v. *Ohio,* 378 U.S. 184, 195. What to one judge may seem incontestably obscene may be to another merely dull and tawdry. Compare *Womack* v. *United States,* 294 F.2d 204, cert. denied, 365 U.S. 859, with *Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478.

that they contain full-page, colored photographs of nude women on the front and back covers; about 60 percent of the publications are filled either with color photographs or black and white photographs of female nudes; about 95 percent of the photographs in these publications are those of nude females. No useful purpose would be served here in elaborating upon the court's detailed findings on the photographs or upon the textual material contained in the publications. The court concluded that the magazines, "in addition to being obscene, are indecent and offensive to common propriety offending against morality and are lewd and immodest."[4] The court adjudged the magazines a nuisance and ordered their destruction.

In our view, we deem the case of *Sunshine Book Co.* v. *Summerfield*, 355 U.S. 372, per curiam, decisive of this appeal.[5] The history of the *Sunshine Book*

---

[4] The trial judge was undoubtedly under pressure to apply the standards in the *Roth-Sul-Andrews* cases; and in the process, he meticulously and scrupulously analyzed each of the exhibits and arrived at the approximate percentage of nudes in each of the magazines and the approximate percentage devoted to the textual matter. This is quite similar to the technique used by the trial judge in *Sunshine Book Co.* v. *Summerfield*, 128 F. Sup. 564, 571, 572. This approach prompted Thurman Arnold to say: "The spectacle of a judge poring over the picture of some nude, trying to ascertain the extent to which she arouses prurient interests, and then attempting to write an opinion which explains the difference between that nude and some other nude has elements of low comedy." Kalven, "The Metaphysics of the Law of Obscenity," 1960 Sup. Ct. Rev. 1, 44, quoting from the brief (p. 22) of the respondent-appellant in *Vermont* v. *Verham News Corporation*, 121 Vt. 269.

[5] Cf. *Parmelee* v. *United States*, 113 F.2d 729, where the only question before the court was whether the book, "Nudism in Modern Life," was obscene. *Miller, J.*, held that the book, under the applicable standard was not obscene; *Vinson, J.*, dissented. See also *United States* v. *4200 Copies International Journal*, 134 F. Sup. 490, where nudist publications designed to portray nudist practices and to secure new converts to the movement were held obscene and subject to condemnation and destruction. On appeal to the Court of Appeals, the judgment was affirmed, per curiam. *Mounce* v. *United States*, 247 F.2d 148. And on appeal to the United States Supreme Court, upon confession of error by the solicitor general, the judgment of the Court

case unfolds an interesting, if not unusual, background. There, the postmaster general found the February, 1955, issue of "Sunshine and Health"[6] and the January-February issue of "Sun Magazine"[7] obscene and unmailable.[8] The District Court affirmed the findings of the postmaster general. *Sunshine*

of Appeals was vacated and the case remanded to the District Court for consideration in the light of *Roth* v. *United States,* 354 U.S. 476. *Mounce* v. *United States,* 355 U.S. 180.

[6] The hearing examiner of the post office department described in detail the material in the February, 1955, issue of "Sunshine and Health" as follows: "The front cover displays a full-page photograph in color of an entirely nude, young, attractive and shapely woman. On the inside of the front cover is another large photograph of a woman whose upper body and breasts are nude. On the rear cover there appears a large photograph of naked women and a naked man. The inside pages contain some 15 photographs of naked men, women and children, singly and in groups. Details of naked buttocks, female breasts and pubic areas, and male genitalia are clearly revealed in some of them . . . ." Brief (p. 4) of the respondent in opposition on petition for certiorari in *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

[7] The January-February issue of "Sun Magazine" was described in this way: "On the front cover and on the inside of the front cover are large photographs of two naked women, the former being in natural color. The rear cover displays a photograph of two naked women in a rubber raft floating on the water. Within the pages of the magazine are found some 25 or 26 photographs of naked men, women and children, shown singly and in groups. In some of these female breats [sic] and pubes and male genitalia are clearly revealed . . . ." Brief (p. 9) of the respondent in opposition on petition for certiorari in *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

[8] The hearing examiner ruled: "The right to practice nudism and to advocate its practices by any lawful means is not in issue here. But in the course of such advocacy the display of unadorned nakedness to the public generally is surely offensive to presently prevailing American standards of decency and modesty. The fact that the photographs in these magazines may illustrate nudist life and activities and are accompanied by relevant textual matter upon the subject does not in any way tend to lessen the erotic impact of the photographs themselves upon the mind of the ordinary person. For these reasons I regard the two issues of 'Sunshine and Health' and 'Sun Magazine' in evidence as obscene, lewd, lascivious and indecent. (Cf. *Sunshine Book Co.* v. *McCaffrey* [8 Misc. 2d 327] . . . .)" Brief (p. 10) of the respondent in opposition on petition for certiorari in *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

*Book Co.* v. *Summerfield,* 128 F. Sup. 564. On appeal to the Court of Appeals, the judgment of the District Court was reversed upon the ground that, inter alia, improper standards had been applied in making a determination of obscenity.[9] Thereafter, the government moved for and was granted a rehearing by the court sitting en banc. See *Sunshine Book Co.* v. *Summerfield,* 249 F.2d 114, 116 n.4. Sitting en banc, the court, composed of eight judges,[10] in a five-to-three decision took a position contrary to its earlier determination by the three-judge division and affirmed the judgment of the District Court.[11] Ibid. On appeal to the United States Supreme Court, the petition for a writ of certiorari was granted, per curiam, and the judgment of the Court of Appeals was reversed; only *Roth* was cited. *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

This summary reversal has provoked lively discussion in the courts and among the commentators. To our own Supreme Court, it did not appear whether the United States Supreme Court made an independent examination of the allegedly obscene material in question; our court assumed that the United States Supreme Court applied the standard laid down in *Roth. State* v. *Andrews,* supra, 98. To the Supreme Court of California, it seemed clear that the "most plausible meaning of . . . [this summary reversal] in view of the citation of only *Roth* . . . , must be that the materials there involved could not be held obscene." *Zeitlin* v. *Arnebergh,* 59

---

[9] The opinion of the Court of Appeals is unreported. A copy appears in appendix 2 (p. 62) to the petition for certiorari in *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

[10] Circuit Judge Burger took no part in the hearing or consideration of this case. *Sunshine Book Co.* v. *Summerfield,* 249 F.2d 114, 115.

[11] The judgment of the court was announced by *Danaher, J.,* in an opinion joined in by *Prettyman, Miller* and *Bastian, Js.; Fahy, J.,* concurred separately; *Washington, J.,* joined by *Edgerton, C. J.,* and *Bazelon, J.,* dissented.

Cal. 2d 901, 916. To the majority of the Court of
Appeals of Maryland, it appeared "that the reversal
was based on the concept that mere nudity is not
obscenity or the decision may have been based on the
fact that the text was not in fact obscene." *Monfred
v. State,* 226 Md. 312, 321.[12] To Judge Soper, the per
curiam reversal was explicable "only on the theory
that . . . [the lower courts] paid insufficient regard
to the rule that in judging accused material attention
should be directed not to detached and separate por-
tions but to the whole material in its entire context."
*Collier v. United States,* 283 F.2d 780, 782; see *Poss
v. Christenberry,* 179 F. Sup. 411, 416. To Professor
Kalven, "the Court . . . [was] feeling the pressure
generated by the two-level theory to restrict obscen-
ity to the worthless and hence something akin to
hard-core pornography." Kalven, "The Metaphysics
of the Law of Obscenity," 1960 Sup. Ct. Rev. 1, 43.
To another commentator, it was not easy to discern
the court's basis for reversal because the standards
set forth in the lower courts were consistent with the
*Roth* requirements; however, there was considerable
dissension in the Court of Appeals on whether the
magazines had been judged as a whole. Comment,
"Per Curiam Decisions of the Supreme Court: 1957
Term," 26 U. Chi. L. Rev. 279, 312. To Professors
Emerson and Haber, "[t]his [summary reversal]
may mean either that the Court did not question the
Post Office power but merely the finding of obscenity,
or that since the material in question was not obscene
the issue of the Post Office power over obscene mate-
rial did not have to be decided." 2 Emerson & Haber,
Political and Civil Rights in the United States,

---

[12] To Judge Hammond, dissenting in *Monfred v. State,* it appeared
(p. 338) that "[t]he Supreme Court must have made an independent
examination of the material . . . and found that censorship offended
constitutional privileges for the Court simply reversed on the citation
of *Roth,* and so terminated the litigation and gave final protection
to the material." Cf. *Newark v. Licht,* 83 N.J. Super. 449, 504 n.

p. 873. It would seem to us that where, as in this case, the United States Supreme Court granted certiorari and reversed, per curiam, without argument or the submission of briefs, it must mean that the law was clear that the material was not obscene.[13] In any event the reversal, grounded upon *Roth,* brought an end to the litigation and permitted the magazines to go through the mails. See Paul & Schwartz, Federal Censorship: Obscenity in the Mail, p. 152.

Nothing, of course, in this opinion is to be construed as indicating our approval or disapproval of these magazines. All we decide is whether the publications are obscene in the light of applicable standards and therefore subject to repression. Nor does our decision in this case require an expression of opinion, judicial or otherwise, concerning the relative merits of a gymnosophical society; for obviously, the answer to a sociological phenomenon of this kind lies outside our professional competence. Our determination of this case is restricted to the sole question whether the material in question is suppressible under applicable standards. In holding that the impugned material is not obscene, we rest our decision squarely upon our interpretation of *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372.

There is error, the judgment is set aside and the case is remanded with direction to render judgment that the magazines are not obscene, and to vacate the order of confiscation and destruction.

In this opinion DEARINGTON, J., concurred; CICALA, J., dissented.

---

[13] "The most likely explanation is that the Court found for itself that the magazines in question were not 'obscene' within the constitutional standard." Lockhart & McClure, "Censorship of Obscenity: The Developing Constitutional Standards," 45 Minn. L. Rev. 5, 34 n.168 (3).