STATE OF CONNECTICUT *v.* JAMES J. ONORATO

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CR 15-6333

Argued October 25—decided December 23, 1965

*Alvin Pudlin,* of New Britain, for the appellant (defendant).

*Mark S. Shipman,* assistant prosecuting attorney, for the appellee (state).

KOSICKI, J. The defendant was convicted of selling a book, allegedly obscene, in violation of § 53-243 of the General Statutes, the pertinent part of which reads as follows: "Any person who . . . sells . . . or has in his possession with intent to sell . . . any book . . . containing obscene, indecent or impure language . . . shall be" punished. The only evidence of obscenity was the book itself, which is before us as an exhibit. Neither side offered any expert testimony to assist or guide the trial court in reaching its decision; nor was such evidence, though admissible, indispensable in order that the court reach the

ultimate conclusion that the work in question was obscene within the proscription of § 53-243 and therefore not within the protection of the safeguards of our federal and state constitutions relating to freedom of speech and expression. See *Smith* v. *California,* 361 U.S. 147, 165 (Frankfurter, J., concurring) ; *Stiwinter* v. *Roberts,* 153 Conn. 240.

The essential facts are not challenged.[1] On August 4, 1964, a police officer of the New Britain police department purchased from the defendant for seventy-five cents a paperbound copy of a book entitled "The Sex Diary of Gerard Sorme," written by Colin Wilson, a reputable author, and the first of an artistic coterie in postwar England known as angry young men. The book was displayed openly in a bookrack containing some 200 different titles and located in a combination variety store and bus terminal. The defendant, who was an employee of a corporation owning and operating this place of business, upon making the sale placed the book in a paper bag and delivered the package to the police officer. The defendant had been the owner and operator of the store prior to its incorporation late in 1963. After incorporation, he still continued to conduct the business, operated the store, and was in supreme authority.

The foregoing facts, found by the court, are not vulnerable to the defendant's attack by his motion to correct the finding. Whatever corrections are sought are of an inconsequential nature and would in no material respect influence our consideration of the defendant's claims as to erroneous conclusions

---

[1] The transcript filed by the defendant in support of his motion to correct the finding and his general assignment of error (Practice Book §§ 960, 995) shows that the main issue presented on trial was that of scienter. The court necessarily would first have to and did include in its finding the necessary subordinate facts and conclusions as to obscenity, and that issue is properly before us on appeal.

and the ultimate decision of guilt reached by the trial court.

The issues of law raised by the defendant may be simply stated: (1) Was the book in question obscene within the terms of § 53-243 and under the constitutional standards established by the Supreme Court of the United States? (2) Was there error in the finding that the defendant knew that the book was obscene? (3) Did the court err in finding the defendant guilty of the crime charged on evidence beyond a reasonable doubt?

A general outline of the contents of the book, which we have read, appears on its jacket thus: "Cast in the traditional literary form of a diary, it is a day-by-day account of Gerard Sorme's adventures—with Gertrude and her niece Caroline, with Carlotta, the German servant girl, with Diana, wife of a somewhat mad composer and inventor, and with Cunningham, who practices a form of sexual 'black magic'." This is a rather modest appraisal, both in the scope of its theme and in the number of the erotic characters and the lubricious episodes in which they are linked. The sexual scenes and experiences, narrated in meticulous detail and without a trace of shyness or reticence, are vivid portrayals or broad hints of libidinous relations and interactions of a heterosexual and homosexual sort and include thinly disguised suggestions of practices sexually perverse. The author, in expressing his aims on the cover of the book, states that it was written because he felt that "no one has ever treated sex, from the man's angle, with intelligence as well as frankness." He entertains the hope that the book speaks for itself. We may add the comment that the book also speaks at times in a language which is not uttered in our classrooms, or in public places, or in the living and drawing rooms of private homes; nor does it serve a useful purpose in polite conversation

or tend to ennoble the animated murmur of genteel society over its fragrant and stimulating teacups.

The defendant's first claim of error does not present a new question of law. "Obscenity is not protected by the unconditional language of the first amendment to the federal constitution. *Roth* v. *United States,* 354 U.S. 476, 483 . . . . The primary requirements of decency may be enforced against obscene publications. *Kingsley Books, Inc.* v. *Brown,* 354 U.S. 436, 440 . . . ; *Chaplinsky* v. *New Hampshire,* 316 U.S. 568, 572 . . . . The same holds true of article first, § 6, of the constitution of Connecticut." *State* v. *Sul,* 146 Conn. 78, 84.

In every appeal from a conviction based upon the sale of a book allegedly obscene, the determination of the issue of obscenity involves a constitutional judgment which the appellate court is under a duty to make independently. "Hence we reaffirm the principle that, in 'obscenity' cases as in all others involving rights derived from the First Amendment guarantees of free expression, this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." *Jacobellis* v. *Ohio,* 378 U.S. 184, 190. In *State* v. *Andrews,* 150 Conn. 92, 100, Chief Justice Baldwin, quoting from the dissenting opinion of Mr. Justice Harlan in *Roth* v. *United States,* supra, 497, reiterated the same rule as applicable in state cases in Connecticut: "[T]he constitutional question whether a particular book may be suppressed cannot be a 'mere matter of classification, of "fact", to be entrusted to a fact-finder and insulated from independent constitutional judgment. . . . The suppression of a particular writing or other tangible form of expression is, therefore, an *individual* matter, and . . . raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether

the attacked expression is suppressible within constitutional standards.' In short, the appellate court cannot escape this responsibility by saying that the trier of facts, judge or jury, has labeled the questioned matter obscene and that there is some evidence to support such a finding." We are faced then with the task of forming our own independent judgment on the question whether under all the circumstances the defendant violated § 53-243. This requires that we first determine whether the book on which the prosecution in this case was based was obscene within the meaning of the *Jacobellis-Roth-Sul-Andrews* test.

The test contemplates that, to be excluded from constitutional protection, any manifestation or work of speech or expression, considered as a whole, must have a predominant appeal to prurient interest, that is, a shameful or morbid interest in nudity, sex or excretion, and must go substantially beyond the customary limits of candor in describing or representing such matters; and that it is utterly without redeeming social importance and serves no useful social purpose. The apt criterion is whether to the average person, applying contemporary community standards, on a national basis, the dominant theme of the material, taken as a whole, appeals to prurient interest. *Jacobellis* v. *Ohio,* supra, 191, 195; *Roth* v. *United States,* supra, 484, 487 n.20, 489; *State* v. *Andrews,* supra, 102; *State* v. *Sul,* supra, 85.

It has often been asserted that the legislative intendment of a "censorship" statute such as ours was to prevent dissemination of material deemed harmful to the moral, disciplined, healthful and happy development of children. This objective can be and has been reached under the provisions of § 53-244, aimed specifically at the sale or delivery of such material to persons under the age of eighteen years. The enforcement of a similar statute in

Rhode Island has been cited with favor by Mr. Justice Brennan in *Jacobellis,* supra, 195 n.11. See *State* v. *Settle,* 90 R.I. 195.

In applying the foregoing tests of obscenity, we make no pretense of passing a judgment on the literary value or artistic merit of the book before us and subject to our original examination. We may note in passing, however, that from antiquity to our present day many works have found acceptance among the community at large as well as among those of discriminating literary taste, notwithstanding their apparent crudities in theme and a base vulgarity in expression.[2] The modern works, having a lawful circulation, and exhibiting a likeness in content and looseness of expression, are too numerous to mention. Although we may deplore the atavistic regression in words and phrases so often encountered in such books and express individual concern that this tendency, if unabatedly persisted in, will tend to reduce the beauty and majesty of our civilized language—evolved over thousands of years of thought-provoking struggle—to a crumbling, shapeless, inordinate rubble, we cannot asseverate to ourselves, in the performance of our judicial duties, the role of arbiters of words, language or expression. *Grove Press, Inc.* v. *Christenberry,* 276 F.2d 433, 438-39. We can only adjudge whether or not the defendant has violated § 53-243 in selling an obscene book.

In further consideration of the issue before us, it is our opinion that we are free to make a judicial comparison between the book in question and other contemporaneous publications (examined by us) of

---

[2] Cf. Petronius, "The Satyricon," a startlingly direct account of amorous and perverted sex episodes and fashions prevailing in Nero's time during the decadence of the Roman Empire; Juvenal's Second, Sixth and Ninth Satires; Ovid's, "Ars Amatoria"; and others of like import which can be purchased in college bookstores or found in university libraries.

striking similarity in theme and verbal usage which have been declared not obscene by our high and the highest appellate courts. *Grove Press, Inc.* v. *Gerstein,* 378 U.S. 577 (reversing, without opinion, the decision of the District Court of Appeals of Florida, which had affirmed a conviction resulting from sale and distribution of "Tropic of Cancer"); *State* v. *Huntington,* 152 Conn. 701 (same book, setting aside conviction "in deference" to the aforesaid decision of the Supreme Court of the United States); *Grove Press, Inc.* v. *Christenberry,* supra (affirming judgment of District Court [175 F. Sup. 488] that "Lady Chatterly's Lover" was not obscene); see such cases as *Manual Enterprises* v. *Day,* 370 U.S. 478 (magazines); *People* v. *Richmond County News, Inc.,* 9 N.Y.2d 578 (magazine); *Big Table, Inc.* v. *Schroeder,* 186 F. Sup. 254 (magazine).

For the foregoing reasons, we conclude that the book "The Sex Diary of Gerard Sorme" is not obscene or indecent within the terms of § 53-243. It therefore becomes unnecessary to decide the defendant's remaining claims of error.

There is error; the judgment is set aside and the case is remanded with direction to render judgment that the defendant is not guilty and ordering that he be discharged.

In this opinion DEARINGTON, J., concurred.

JACOBS, J. (concurring). In Colin Wilson's weird sex diary[3]—the diary of an existentialist—the author is quoted on the jacket as saying: "[T]his book was written because I feel no one has ever treated sex, from the man's angle, with intelligence as well as frankness. I believe a writer should, so far

---

[3] This is a paperback edition of Wilson's book, "The Sex Diary of Gerard Sorme" (Dial Press, 1963), and is priced at 75 cents a copy. The frontjacket blurb reads: "An extraordinary original—often outrageous novel by the author of THE OUTSIDER and the first of England's so-called Angry Young Men . . . ."

as he can, 'tell the whole truth' about himself. This book, I hope, speaks for itself." It does. Skilled reviewers[4] have variously described this fictional novel as "dismal," "fatuous," "woeful stuff," "contradictory," "seedy," "wearisomely repetitious," and "drab"—to mention only a few descriptive phrases. The diary entries range backward in point of time to Sorme's sexual initiation and move forward with unrelenting frankness until it reaches a final and climactic rite of orgiastic black magic. The diary contains some of the crudest passages about sex—crudest in feeling, that is—and no details are left uncrated. The long philosophical passages which are interspersed among the entries have only the most tenuous connection with Sorme's bizarre experiences. The central theme of the diary seems to be: If the mind could be properly used, love of life could be intensified tenfold; man would be a god if he could only enlarge his consciousness; man needs to live more fully and the strength of his mind needs to be more intensified; the way to accomplish this great goal is through a heightened awareness of sex as life's driving force. Basically, however, the diary all adds up to an extremely distasteful mixture of white magic, black magic, "sex magic," acts of perversion, consorting with criminal characters, and encounters with a series of rather colorless young women. It is painfully protracted. We, too, wonder: "How was the author of this stupefying pretentious piffle ever mistaken for a young man of genius by London's most eminent critics?"[5]

---

[4] See, for example, reviews in the following publications: 38 Library Journal, No. 9, p. 1905 (May 1, 1963); The Atlantic, p. 126 (Sept. 1963); The New Republic, p. 32 (May 4, 1963); Newsweek, p. 87 (June 3, 1963); Time, p. 87 (May 31, 1963); New York Herald Tribune, Book Section, p. 10 (June 23, 1963); The New Yorker, p. 177 (May 18, 1963); The Times Literary Supplement, p. 881 (Nov. 1, 1963); New Statesman, p. 623 (Nov. 1, 1963); Punch, p. 688 (Nov. 6, 1963); cf. The Oregonian (May 5, 1963).
[5] Time, p. 87 (May 31, 1963).

This controversy arises out of the state's attempt to control traffic in obscene material through the application of criminal sanctions. The problem raised in this country, as well as in Britain, has been put in this way: "The law about obscene publications . . . 'is the product of conflicting emotions, which tend to be expressed with exaggerated violence. There are the implanted distrust of official censorship, the claim of writers to be allowed to explore the world and to express themselves in freedom, and the claim of readers to enjoyment of the complementary freedom. And ranged against these libertarian claims is a set of restrictionist ones: the duty to protect the morals of the susceptible and immature, the wish to prevent visible degeneration of the conventions of public discourse, and dislike of too blatant an affront to what at any given time are held to be the decencies of verbal or pictorial exhibition.' " Williams, "The Control of Obscenity," 1 Crim. L. Rev. (Eng.). 471 (Aug. 1965), quoting from "The Times" (of London), p. 15 (May 7, 1964). Our task upon review, bearing in mind the conflicting claims of society on the one hand and the first amendment guarantees on the other, "is onerous and exacting, demanding as it does the utmost discipline in objectivity, the severest control of personal predilections. But it cannot be escaped, not even by disavowing that such is the nature of our task." *Kingsley International Pictures Corporation* v. *Regents,* 360 U.S. 684, 697 (Frankfurter, J., concurring). And so, however we may appraise this largely undisciplined posturing about Sorme's encounters with sex, our task is to determine whether the book in question is obscene in the light of applicable constitutional standards as laid down in the *Roth-Sul-Andrews*[6] trichotomy and also with due deference to

---

[6] We referred to *Roth* v. *United States,* 354 U.S. 476, *State* v. *Sul,* 146 Conn. 78, and *State* v. *Andrews,* 150 Conn. 92 as the *Roth-Sul-*

the pronouncements of the Supreme Court of the United States. See *State* v. *Huntington,* 152 Conn. 701. When, therefore, one takes a hard look at the history of obscenity and censorship cases[7] over the past dozen years, of what has been allowed to be published and circulated, and what has been suppressed on constitutional grounds, the book in question would seem to fall within the area of permissible

*Andrews* trichotomy in *State* v. *Martin,* 3 Conn. Cir. Ct. 309, 311 n.4. *State* v. *Cercone,* 2 Conn. Cir. Ct. 144; *State* v. *Onorato,* 2 Conn. Cir. Ct. 428, 430; *State* v. *Keyhole Publishing Co.,* 3 Conn. Cir. Ct. 354.

[7] See *Joseph Burstyn, Inc.* v. *Wilson,* 343 U.S. 495 (New York statute permitting the banning of motion picture films on a censor's finding that the film is "sacrilegious" held void as a prior restraint on freedom of speech and press); *Superior Films, Inc.* v. *Department of Education* and *Commercial Pictures Corporation* v. *Regents,* 346 U.S. 587 (judgments reversed on authority of *Joseph Burstyn, Inc.* v. *Wilson,* supra); *Kingsley Books, Inc.* v. *Brown,* 354 U.S. 436 (New York proceedings enjoining distribution of "Nights of Horror"; statute sustained as a remedial scheme for the outlawry of obscene books); *Adams Newark Theater Co.* v. *Newark,* 354 U.S. 931 (constitutionality of Newark ordinance prohibiting the showing of "lewd, obscene or indecent" performances sustained in per curiam decision); *Roth* v. *United States* (conviction for mailing of obscene material under federal antiobscenity statute sustained), and *Alberts* v. *California* (conviction for selling obscene and indecent books under California penal code sustained), 354 U.S. 476; *Times Film Corporation* v. *Chicago,* 355 U.S. 35 (motion picture "Game of Love" held nonobscene, per curiam, reversing 244 F.2d 432); *Mounce* v. *United States,* 355 U.S. 180 (imported collection of nudist and art student publications containing many nude photographs; per curiam, reversing 247 F.2d 148); *One, Inc.* v. *Olesen,* 355 U.S. 371 (postal order finding "One—The Homosexual Magazine" nonmailable because obscene; per curiam, reversing 241 F.2d 772); *Sunshine Book Co.* v. *Summerfield,* 355 U.S. 372 (postal order holding magazines "Sunshine and Health" and "Sun Magazine" obscene; per curiam, reversing 249 F.2d 114); cf. *State* v. *Martin,* 3 Conn. Cir. Ct. 309; *Kingsley International Pictures Corporation* v. *Regents,* 360 U.S. 684 (Regents' determination that French film version of D. H. Lawrence's novel, "Lady Chatterley's Lover," was "immoral"; New York statute held unconstitutional, reversing 4 N.Y.2d 349); *Smith* v. *California,* 361 U.S. 147 (requirement of scienter in criminal prosecutions for obscenity essential; reversing 161 Cal. App. 2d Sup. 860); see *State* v. *Andrews,* 150 Conn. 92, 95; *Marcus* v. *Search Warrant,* 367 U.S. 717 (Missouri's use of the search and seizure power to suppress

publications. In reaching this conclusion, we put to one side all our personal predilections, including our distaste for commercial exploitation of sensuality; the book under attack here, appraised as objectively as we can, may not be adjudged obscene lest we impair society's vital interest in freedom of expression.

---

obscene publications held inimical to protected expression, reversing 334 S.W.2d 119); *Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478 (postal order barring shipment of magazines consisting largely of photographs of nude or near-nude male models in addition to advertisements by photographers offering nudist photographs for sale; magazines held not subject to repression, reversing 289 F.2d 455); *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58 (Rhode Island Commission to Encourage Morality in Youth, created by statute, was authorized, inter alia, to review questionable publications and recommend prosecution; activities of commission held unconstitutional and case remanded for further proceedings reversing 176 A.2d 393 [R.I.]); *Jacobellis* v. *Ohio,* 378 U.S. 184 (conviction under Ohio statute for possessing and exhibiting French film "Les Amants"; motion picture held not obscene, reversing 173 Ohio St. 22); *A Quantity of Books* v. *Kansas,* 378 U.S. 205 (Kansas procedure in issuing and executing warrant of seizure of certain paperback novels prior to hearing on the issue of obscenity held unconstitutional under the first amendment, made applicable to the states by the fourteenth amendment, reversing 191 Kan. 13); *Tralins* v. *Gerstein,* 378 U.S. 576 ("Pleasure Was My Business" condemned as obscene and its dissemination enjoined; held, per curiam, certiorari granted, reversing 151 So. 2d 19 [Fla.]); *Grove Press, Inc.* v. *Gerstein,* 378 U.S. 577 (distribution of "Tropic of Cancer" enjoined as obscene; held, per curiam, certiorari granted, reversing 156 So. 2d 537 [Fla.]); see *State* v. *Huntington,* 152 Conn. 701; *Freedman* v. *Maryland,* 380 U.S. 51 (conviction for exhibiting the film "Revenge at Daybreak" without first having submitted it to the Maryland board of censors; held that noncriminal process requiring prior submission avoids constitutional infirmity only if statutory scheme provides adequate statutory provision for judicial participation, reversing 233 Md. 498); *Trans-Lux Distributing Corporation* v. *Regents,* 380 U.S. 259 (Board of Regents of New York directed elimination of two scenes from the film "A Stranger Knocks"; per curiam, reversing 14 N.Y.2d 88). "[I]n virtually every case decided by the Supreme Court [of the United States], the disseminator has had a favorable result on one ground or another, save for three cases decided on the same day in 1957." *United States* v. *Klaw,* 350 F.2d 155, 158.