(No. 37988.—

THE CITY OF CHICAGO, Appellee, *vs.* CHARLES KIMMEL, Appellant.

*Opinion filed September 29, 1964.*

Howard T. Savage, of Chicago, for appellant.

John C. Melaniphy, Corporation Counsel, of Chicago, (Sydney R. Drebin and Robert J. Collins, Assistant Corporation Counsel, of counsel,) for appellee.

Per Curiam: Defendant, Charles Kimmel, owner and operator of a bookstore in Chicago, was charged with having sold two obscene books in violation of a Chicago ordinance. He was tried in the municipal court of Chicago before a jury, found guilty and fined $200 and costs as to each book. From the said judgments and fines, he prosecutes this appeal and prays that they may be reversed. Since the constitutional issue of freedom of speech is directly involved, this appeal is properly before this court.

From the record it appears that on June 4, 1962, a police officer purchased two books from the defendant which were entitled "Campus Mistress" and "Born To Be Made." Both books were introduced into evidence without objection, but were not submitted to the jury during

the trial. Defendant's motion to withdraw the books from the consideration of the jury was denied, and the books were given to the jury for their deliberation. No other evidence of the contents of the books was introduced, and the trial court's instructions have not been preserved in the record. The jury specifically found both books to be obscene and found that the defendant had knowledge of their obscenity.

The applicable ordinance provides as follows:

"It shall be unlawful for any person knowingly to exhibit, sell, print, offer to sell, give away, circulate, publish, distribute or attempt to distribute any obscene book, magazine, pamphlet, paper, writing, card, advertisement, circular, print, picture, photograph, motion picture film, play, image, instrument, statue, drawing or other article which is obscene. Any person violating any provision of this section shall be fined not less than $20.00 nor more than $200.00 for each offense.

"Obscene for the purpose of this section is defined as follows: Whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Section 192.9 Municipal Code of Chicago.

Defendant attacks the ordinance as constituting an unconstitutional abridgement of the right of free speech as guaranteed by section 4 of article II of the constitution of Illinois, and by the first and fourteenth amendments to the constitution of the United States. He further claims that the evidence fails to establish either the obscenity of the books or scienter on the part of defendant.

Defendant does not contest the well settled principle that obscenity is not within the protection of the constitutional guarantees of free speech. (*Roth* v. *United States*, 354 U.S. 476, 1 L. ed. 2d 1498.) However, he attacks the constitutionality of the present Chicago ordinance, contending that the legislative definition of obscenity, while pur-

porting to follow the language of *Roth* omits the qualification that obscenity must be "utterly without redeeming social importance." While it is true that in *Roth* the United States Supreme Court stated that obscenity is "utterly without redeeming social importance," (354 U.S. at 484,) the court there upheld a conviction based upon a California statute containing no definition of obscenity. The defendant there argued that in absence of a definition of obscenity, the statute was void for failing to provide reasonably ascertainable standards of guilt. The court rejected this argument, stating at 354 U.S. pp. 491-492:

"Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '* * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * *.' United States v. Petrillo, 332 U.S. 1, 7, 8, 91 L. ed. 1877, 1883, 67 S. Ct. 1538. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark '* * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense.' [Citations omitted.]

"In summary, then, we hold that these statutes, applied according to the proper standard for judging obscenity, do not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited."

Based on this standard we hold that the ordinance before us is valid. It would be most unreasonable to require

a legislative draftsman to incorporate every nuance of constitutional dictum into a statutory definition. The present ordinance, applied according to the proper standard for judging obscenity, will sustain a conviction. Since the defendant did not see fit to preserve the jury instructions for review, we cannot say that the ordinance was improperly applied.

Defendant further contends that the proof of his guilt was deficient in that there was no evidence of contemporary community standards, that there was no evidence of the obscene content of the books, and the books were not read by the trial court, or by the jury in open court.

Defendant offered no evidence relating to contemporary community standards, and in the absence of such evidence, the triers of fact "are the exclusive judges of what the common conscience of the community is." (*Roth* v. *United States,* 354 U.S. 476, 490, 1 L. ed. 2d 1498, 1510.) Nor did defendant offer evidence of the literary merit of the publications. On that state of the record we hold that it was proper for the trial court to submit the publications to the jury under proper instructions as to the applicable standards for judging obscenity. It was also proper for the books, which were admitted into evidence, to be taken to the jury room without having been read to the jury in open court. Ill. Rev. Stat. 1961, chap. 110, par. 67(4); *Ridgway* v. *Crum,* 343 Ill. App. 12, 22.

The book "Campus Mistress" is a paper-back novel concerning the adventures of a 17-year-old girl who lives in a fashionable metropolitan suburb. She has graduated from high school and has been dating college boys. While at a summer resort with her parents, she meets a girl named Winnie in a bar and accompanies her to the "beatnik" section in the resort village. Winnie introduces her to a photographer who gets her intoxicated and takes photographs of her in the nude while she is unconscious. Then

Winnie makes sexual advances to her. She manages to escape and meets a boy friend from home who has followed her to the resort to profess his love for her. She returns home after these sordid experiences and does not date for some time. The story ends before she goes to college so the title of the book is somewhat interesting. Perhaps there is a moral to this novel as the young girl seeking adventure finds that some experiences can be sordid and is most anxious to return home. Many parts of the book pertain to questionable philosophical conversations which the "beatniks" are reported to engage in.

The other book "Born to Be Made" is a paper back novel about Marvelle Martindale, a senior in high school. She is attractive, intelligent and sexually aggressive. She seduces several high school boys as well as the chemistry teacher. Marvelle and a boy are surprised in the nude by the boy's mother and the board of education considers denying Marvelle her high school diploma, but later drops the matter. A travelling salesman meets her and she goes to New York City with him as his mistress. From there on the book is an account of her love affairs and sex life with various men. However, the author does not go into great detail. Marvelle becomes an alcoholic and has to be hospitalized several times for treatment. To relieve her boredom she begins to write, her manuscripts are accepted for publication, and she becomes a success. A man in the entertainment field desired her as his mistress, seeks to eliminate competition, and the result is that he is shot by Marvelle's literary agent. At the end of the story she marries and she and her husband try to solve her drinking problem.

Aside from Marvelle's experiences with men, the book could be said to be concerned with the problems of alcoholism and its effect on people's actions and minds.

Although a jury decided that these books were obscene, we cannot avoid making an independent constitutional judg-

ment as to whether the books themselves are in fact obscene or contitutionally protected. *Jacobellis* v. *Ohio,* 378 U.S. 184, 12 L. ed. 2d 793, 84 S. Ct. 1676 at 1680.

It was stated in *Jacobellis*:

"The question of the proper standard for making this determination has been the subject of much discussion and controversy since our decision in *Roth-Alberts* seven years ago. Recognizing that the test for obscenity enunciated there—'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest,' 354 U.S. at 489, 77 S. Ct., at 1311—is not perfect, we think any substitute would raise equally difficult problems, and we therefore adhere to that standard. We would reiterate, however, our recognition in *Roth* that obscenity is excluded from the constitutional protection only because it is 'utterly without redeeming social importance,' and that '[t]he portrayal of sex, *e.g.*, in art, literature, and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press,' *Id.*, 354 U.S. at 484, 487, 77 S. Ct. at 1310. It follows that material dealing with sex in a manner that advocates ideas, *Kingsley Int'l Pictures Corp.* v. *Regents,* 360 U.S. 684, 79 S. Ct. 1362, 3 L. ed. 2d 1512, or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance. See *Zeitlin* v. *Arnebergh,* 59 Cal.2d 901, 920, 31 Cal. Rptr. 800, 813, 383 P.2d 152, 165, (1963). It should also be recognized that the *Roth* standard requires in the first instance a finding that the material 'goes substantially beyond customary limits of candor in description or representation of such matters.' This was a requirement of the Model Penal Code

test that we approved in *Roth,* 354 U.S., at 487, n. 20, 77 S. Ct. at 1310 and it is explicitly reaffirmed in the more recent 'Proposed Official Draft' of the Code. In the absence of such a deviation from society's standards of decency, we do not see how any official inquiry into the allegedly prurient appeal of a work of expression can be squared with the guarantees of the First and Fourteenth Amendments. See *Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478, 482-488, 82 S. Ct. 1432, 1434-1438 (separate opinion).

"It has been suggested that the 'contemporary community standards' aspect of the *Roth* test implies a determination of the constitutional question of obscenity in each case by the standards of the particular local community from which the case arises. This is an *incorrect* (emphasis added) reading of *Roth.*"

There the court also stated that "community" refers not to a local community, but rather to society at large so that the concept of obscenity would not have a varying meaning.

In *Jacobellis* it was also stated:

"We recognize the legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to 'reduce the adult population * * * to reading only what is fit for children.' "

Since we are bound by the holdings of the United States Supreme Court in the matter of first amendment freedoms, we must apply the test of obscenity as set forth by that court. Recently the United States Supreme Court held the book "Tropic of Cancer" not to be obscene for the reasons stated in the *Jacobellis* case. (*Grove Press, Inc.* v. *Gerstein,* —— U.S. ——, 12 L. ed. 2d 1035.) It is difficult to comprehend how this court could hold the books here involved to be obscene, while "Tropic of Cancer" is held to be not obscene.

While we are unimpressed with the literary merit of the works before us, we cannot say that they "go substantially beyond customary limits of candor in description or representation of such matters," or that they are "utterly without redeeming social importance." We accordingly hold that the jury improperly found the books to be obscene.

Due to the fact that we deem these two books not obscene, it is not necessary to pass on defendant's claim that there was insufficient proof of knowledge of the contents of the book by the defendant.

The judgments of the trial court are reversed.

*Judgments reversed.*