(Nos. 39260-1-2 cons.—

THE CITY OF CHICAGO, Appellee, *vs.* UNIVERSAL PUBLISHING AND DISTRIBUTING CORPORATION, Appellant.

*Opinion filed March 24, 1966.*

THOMAS P. SULLIVAN and CHARLES J. MCCARTHY, both of Chicago, (RAYMOND, MAYER, JENNER & BLOCK, of Chicago, and SWIGER, KELLEY, HARRAGAN & SCHOTT, of New York, New York, of counsel,) for appellant.

RAYMOND F. SIMON, Corporation Counsel, of Chicago, (SYDNEY R. DREBIN and MARVIN E. ASPEN, Assistants Corporation Counsel, of counsel,) for appellee.

PER CURIAM: Three separate appeals involving seven paperback books are here consolidated for our consideration. They come directly to us from the circuit court of Cook County because of the constitutional questions involved in prosecutions of individual book sellers and Universal Publishing and Distributing Corporation, the publisher of the questioned books. All were charged with violating chapter 192, section 9 of the Municipal Code of the City of Chicago which prohibits publication, circulation or sale of obscene literature. At the conclusion of bench trials the book sellers were found not guilty in each case because of insufficient proof of *scienter*. The corporate publisher was adjudged guilty and fines of $25 imposed on each of seven counts and a $50 fine on one count.

The single issue before us is whether the books are obscene, defined by the governing ordinance as: "Whether,

to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interests". Resolution of this issue requires an independent constitutional judgment by us as to whether these books fall within or beyond the imprecise boundaries of the constitutional guaranties of freedom of speech and press incorporated in the first amendment to the United States constitution and section 4 of article II of the Illinois constitution. *Jacobellis* v. *Ohio,* 378 U.S. 184, 12 L. Ed. 2d 793, 84 S. Ct. 1676, *City of Chicago* v. *Kimmel,* 31 Ill.2d 202.

The questioned books consist of seven paperbacks of 150-160 pages each. "Instant Love" portrays a motel owner facing financial ruin who finally agrees to an arrangement whereby a panderer places three prostitutes at the motel and operates a poker game there. The owner's problems include his alcoholic wife, and sexual adventures with the motel maid, the prostitutes and a nurse. He finally, although threatened with physical harm and bankruptcy, seeks assistance from law enforcement authorities in terminating the illegal activities and places his wife in a sanatorium. The book ends with indications of an agreed divorce from his wife, her cure from alcoholism and his marriage to the nurse.

The "Marriage Club" deals with a young woman whose husband is intolerably brutal in their sexual relationships. She leaves him and goes to the home of an aunt, a rather frank and bawdy person who operates a matrimonial agency in a building where private rooms are available for such use as the members desire. Two of the aunt's "secretaries" are in fact prostitutes. The niece has several sexual experiences with agency patrons. Her husband attempts to persuade her to return by fraudulent threats against the aunt's property. One of the patrons, with whom the niece has had a sexual relationship, exposes the fraud, and the

final sentence indicates her resumption of their sexual activity and probable marriage.

"Love Hostess" portrays the experiences of a young actor who obtains employment as a tour guide and eventually marries the niece of the tour director. The operations of the tour staff and the tourists involve considerable sexual activity among the staff and the tourists with an episode of lesbianism.

"The Shame of Jenny" portrays a secretary, fearful of spinsterhood, who engages in sexual intercourse with a fellow-employee, is sexually assaulted by her superior, rooms with a lesbian narcotic addict, has numerous sexual experiences with a musician, and ultimately attempts suicide, but is rescued therefrom and decides to marry the musician. Also portrayed are the frustrations involved in her superior's marriage to an abnormally fat wife, his secret desire for the secretary and his ultimate mental breakdown.

"High-School Scandal" depicts a respectable, attractive widow in her mid-thirties who becomes enamored of a seventeen-year old student in one of the classes she teaches. Her seduction of him, and her sexual experience with two other faculty members, one a lesbian, are the dominant theme of the book. The ultimate exposure of her affair with the boy leaves her friendless except for the brother of her deceased husband with whom it appears she will attempt to rebuild her life.

"Her Young Lover" involves a happily married couple who are returning home from an anniversary dinner when they are assaulted by three young men who each rape the wife. The ensuing dissolution of their marriage is caused by the husband's impotency induced by his feeling of guilt in failing to protect his wife from rape. Both engage in extramarital sexual activity. She learns the identity of one of her attackers, and thereafter engages in numerous sexual episodes with him. The book ends with indications that the

husband and wife will be divorced and that each will marry a paramour.

"Cheater's Paradise" revolves chiefly about the marital difficulties in which a resort hotel employee and his wife become enmeshed. It includes numerous sexual episodes involving other partners, an incident of lesbianism and concludes with a reconciliation of the married couple.

The controlling principles in this type of case appear in *Roth* v. *United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304, as later expanded in *Manual Enterprises, Inc.* v. *Day,* 370 U.S. 478, 82 S. Ct. 1432, 8 L. Ed. 2d 639, and *Jacobellis.* Material is obscene if "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest" (*Roth,* p. 489), defined as "a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters." (*Roth,* p. 487, f.n. 20). Obscenity is "utterly without redeeming social importance." (*Roth,* p. 484). "The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." (*Roth,* p. 487, f.n. omitted.) *Manual Enterprises* indicated that obscene material must be "patently offensive".

In three opinions in the past eighteen months we have considered the perplexing problems posed by society's attempts to protect itself from the presumably deleterious effect of obscene writings or utterances without unreasonably curtailing the constitutional guaranties of free speech and free press. In the first, *City of Chicago* v. *Kimmel,* 31 Ill.2d 202, we upheld the constitutionality of the ordinance now before us and held two paperbacks somewhat similar to those here involved constitutionally protected, emphasizing the social problems therein portrayed, and indicating that, since "Tropic of Cancer" had been held not to be

obscene (*Grove Press, Inc.* v. *Gerstein,* 378 U.S. 577, 12 L. Ed. 2d 1035, 84 S. Ct. 1909), the books there in question could not be proscribed since they were not "utterly without redeeming social importance." In *People* v. *Bruce,* 31 Ill.2d 459, an earlier opinion, affirming a trial court judgment that a monologue delivered by a commercial entertainer was obscene, was reversed because the *Jacobellis* decision clearly eliminated the "balancing" test established by *American Civil Liberties Union* v. *City of Chicago,* 3 Ill.2d 334, pursuant to which we had previously held the obscene aspects of the monologue outweighed its affirmative values. We there interpreted *Jacobellis* as immunizing any material which has any social importance. In the third, *People* v. *Sikora,* 32 Ill.2d 260, we rejected an attack upon the constitutionality of the State statute dealing with obscenity (Ill. Rev. Stat. 1963, chap. 38, par. 11—20) and concluded the three paperback books there before us were obscene. We emphasized that none of the books represented any serious attempt to discuss social problems, and that each book was a discussion of sex and perversion totally unrelated to anything else. The bizarre nature of the sexual activity described in those books is apparent even from the brief description of the contents appearing in the opinion. We found it unnecessary to consider whether any standard other than a national one would be constitutionally acceptable since the trial judge had appraised the material in terms of "contemporary community standards in the United States today."

We are now urged to resolve the question of the applicable standard to be used in determining whether given material is obscene. Defendant urges that the United States Supreme Court has restricted the standard to a national one; the State contends no constitutional barrier exists to a local community standard, and that moral concepts prevailing in the community where the alleged offense occurred should be controlling. We agree with the State that

this question is as yet unresolved by the United States Supreme Court (see *Sikora,* p. 264), but there are presently pending before that court several cases in one or more of which a determination of this issue seems likely. Consideration of this fact, coupled with our determination that the result here would be the same irrespective of the standards applied, prompts us to conclude that it is not presently necessary to resolve this issue.

Based upon the foregoing, we must make "an independent constitutional judgment" as to the material before us. In so doing we have compared these books with those considered in *Kimmel* and *Sikora.* All are similar in that the covers, titles and characterizations appearing thereon are suggestive of illicit sexual conduct. But the books must be considered as a whole (*Roth,* p. 489), and their contents in our judgment more nearly resemble those in *Kimmel* and therefore are within the realm of constitutionally protected expression. While no clearly definitive rule in this exceedingly difficult area has yet been announced by the United States Supreme Court, the books here considered are, to us, less "patently offensive" than those held obscene in *Sikora.* While the distinguishing features are not easily described, the material here contains substantially less violence, there is less abnormal sexual conduct, the descriptions of both normal and perverted sexual episodes are less bizarre and the total effect less erotic. The revolting language and "dirty" words of "Tropic of Cancer" are not present here; the description of sexual conduct is no more detailed than in *Kimmel;* no cunnilingus or oral-genital contact is described and apparently none is involved; there is no masturbation, flagellation, masochism or acts of sadism; no male homosexual conduct is involved, and no voyeurism is discussed. There are no transvestite episodes and several of the incidents of lesbianism are "disgusting" to the neophyte partner. The books now before us do, to a limited extent,

deal with common social or marital problems although they certainly are not the type of writing which we would voluntarily read or recommend. Obviously their publication on the basis of literary merit would be unjustified, and they are clearly inappropriate for other than adults. However, it is established that "sex and obscenity are not synonymous", and that "the portrayal of sex is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press." (*Roth* v. *United States,* 354 U.S. 476, 487, 77 S. Ct. 1304, 1 L. Ed. 2d 1498.) We may not weigh the objectionable features of these publications against their affirmative values (*Jacobellis*), and we cannot say they are "utterly without redeeming social importance."

We therefore conclude that the publications herein named are not obscene. The judgments of the circuit court of Cook County are hereby reversed.

*Judgments reversed.*