[Crim. No. 11446. In Bank. Nov. 14, 1968.]

In re ALBERT J. GIANNINI et al. on Habeas Corpus.

564

Pelletreau, Gowen, Moses & Porlier and Kenneth Larson for Petitioners.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Edward P. O'Brien and Michael J. Phelan, Deputy Attorneys General, for Respondent.

James J. Clancy as Amicus Curiae on behalf of Respondent.

TOBRINER, J.—Our ruling in this case rests on the simple proposition that a dance performed before an audience for

entertainment cannot be held to violate the statutory prohibitions of indecent exposure and lewd or dissolute conduct in the absence of proof that the dance, tested in the context of contemporary community standards, appealed to the prurient interest of the audience and affronted standards of decency generally accepted in the community. We explain why we have concluded that both under principles of constitutional law and upon application of the criteria inherent in the involved statutes, conviction could stand only upon presentation of such proof. We likewise set forth our reasons for holding that the relevant community standard is that of the statewide community.

In 1965 a municipal court jury found petitioner Kelley Iser, a "topless" dancer, and petitioner Albert Giannini, the manager of the nightclub in which she danced, guilty of violating Penal Code section 314, subdivision 1 (wilful and lewd exposure) and section 647, subdivision (a) (lewd or dissolute conduct). The appellate department of the superior court affirmed the convictions without opinion; petitioners applied unsuccessfully for transfer of the case to the Court of Appeal.

Giannini and Iser then brought this petition for habeas corpus, alleging that the sections of the Penal Code under which they were convicted are unconstitutionally vague and that the failure of the prosecution to introduce evidence of community standards as to the involved performance rendered the convictions unconstitutional.

1. *The facts.*

Petitioners were convicted of violation of section 314, subdivision 1, and section 647, subdivision (a), of the Penal Code. In relevant part, these sections read as follows: "Section 314. Every person who wilfully and lewdly . . . 1. Exposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby . . . is guilty of a misdemeanor." "Section 647. Every person who commits any of the following acts shall be guilty of disorderly conduct, a misdemeanor: (a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view."

In support of these charges, the prosecution produced two police officers who testified to the following facts. Petitioner Giannini managed the Lighthouse Inn, a nightclub in San Pablo, California; petitioner Iser performed the "topless"

dance featured at the Inn. Wearing tights and a transparent cape, Iser appeared on a spotlighted stage and performed various modern dances, including the "Swim." As part of the act, she removed the cape, exposing the upper portion of her body, and performed a dance called "Walking the Dog" to the music of a song by the same name. "Walking the Dog," according to the officers, consisted of petitioner Iser "wiggling around" for about 30 seconds on her hands and knees with her breasts exposed.

The officers testified that a large sign with the word "Topless" stood outside the club. A small sign at the entrance indicated that minors were not allowed inside; an employee of the Lighthouse Inn checked identification at the doorway. The officers further testified that petitioner Iser's performance could not be seen from outside the club. The only other evidence introduced by the prosecution consisted of photographs depicting petitioner Iser dancing; in some of the pictures her breasts were exposed.

At the conclusion of the People's case, defense counsel moved that the jury be advised to return a verdict of "not guilty" because the prosecution had failed to introduce any evidence as to a material aspect of its case, the contemporary standards of the community with respect to the type of dance at issue. Apparently concluding that the jurors represented the "community" and thus by definition would apply "community standards," the trial court denied the request.

After denial of the motion, the defense called as witnesses the owners of two San Francisco nightclubs. They testified that for several years they had continuously employed "topless" dancers who did the "Swim" and other modern dances; that between 30 and 40 other San Francisco nightclubs employed "topless" entertainers, and that "topless nightclubs" engaged in business in Los Angeles, Santa Rosa, San Rafael, San Diego, Petaluma, Eureka, and Red Bluff. One of the owners further testified that his employees nightly performed the dance "Walking the Dog"; the other testified that the small size of the dancing platforms in his club precluded the performance of that dance.

An attorney, also testifying for the defense, stated that during "Walking the Dog" petitioner Iser wiggled her abdominal area and buttocks, that some interpreted this dance as having "sexual connotations," and that he had seen the same dance rendered on television by fully clothed performers. In addition, the defense introduced various materials

generally available in the San Pablo community, such as Playboy magazine and art books, as evidence of contemporary community standards regarding bare-breasted women.

Among other instructions the trial judge charged the jury, quoting Penal Code section 311, that: " 'Obscene' means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole, is to prurient interest, *i.e.*, a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance."

We have seen that although defendants were found guilty of violation of the prohibition of indecent exposure in Penal Code section 314, subdivision 1, and the prohibition of disorderly conduct in Penal Code section 647, subdivision (a), the alleged offense occurred in the presentation of a dance before an audience. ▮▮▮ We shall point out that the performance of such a dance, like other forms of expression or communication, prima facie enjoys protection under the First Amendment of the Constitution of the United States; it loses such protection upon a showing of its obscenity. To show such obscenity, however, the prosecution must introduce evidence that, applying contemporary community standards, the questioned dance appealed to the prurient interest of the audience and affronted the standards of decency accepted in the community.

In interpreting the terms "lewd" and "dissolute" as used in the statutes under which defendants were charged, the trial court held such words to be synonymous with "obscene" as used in Penal Code section 311 which defines obscenity. Once the First Amendment protection applies to the dance as a medium of expression, and once the court charges the jury in the terms of the obscenity statute, proof that the dance, in the context of contemporary standards, appealed to the prurient interest of the audience and exceeded the customary limits of candor became essential to conviction. The absence of that proof must therefore nullify the judgment.

2. *The performance of a dance for an audience constitutes a method of expression that, in the absence of proof of obscenity, warrants the protection of the First Amendment.*

Although the United States Supreme Court has not ruled on the precise question whether the performance of a dance is

potentially a form of communication protected against state intrusion by the guarantees of the First and Fourteenth Amendments to the federal Constitution, the very definition of dance describes it as an expression of emotions or ideas. Thus, "Dancing consists in the rhythmical movement of any or all parts of the body in accordance with some scheme of individual or concerted action which is expressive of emotions or ideas." (7 Encyclopaedia Britannica (1945) pp. 13-14.) The Century Dictionary and Cyclopedia defines dance as follows: "dance—A succession of more or less regularly ordered steps and movements of the body, commonly guided by rhythmical intervals of a musical accompaniment; any leaping or gliding movement with more or less regular steps and turnings, expressive of or designed to awaken some emotion. The dance is perhaps the earliest and most spontaneous mode of expressing emotion and dramatic feeling; it exists in a great variety of forms and is among some people connected with religious belief and practice, as among the Mohammedans and Hindus." (2 The Century Dictionary and Cyclopedia (1914) p. 1450.)

The Supreme Court has held that analogous media of expression, such as motion pictures, come "within the ambit of the constitutional guarantees of freedom of speech and of the press. *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]." (*Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 187 [12 L.Ed.2d 793, 797, 84 S.Ct. 1676] (judgment of the court per Brennan, J.); see also *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981 [59 Cal.Rptr. 872, 429 P.2d 192].) "It cannot be doubted that motion pictures are a significant *medium* for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging . . . to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501 [96 L.Ed. 1098, 1105, 72 S.Ct. 777].) (Fn. omitted; italics added.)[1]

---

[1]*Other courts have applied these constitutional protections to various types of entertainment. In* Hudson v. United States *(D.C.Ct.App. 1967) 234 A.2d 903, for example, the court struck down a conviction for staging obscene shows, stating that* "*in addition to applying to printed matter, such as books and photographs, the same standards are also extended to motion pictures, plays, and burlesque shows, which are forms of speech and* prima facie *expressions protected by the First Amend-*

The above analysis merely makes applicable to a particular medium the general doctrine that *all* forms of communication, not merely the expression of concrete and definite ideas, *potentially* receive First Amendment protection.[2] "We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and the entertaining is too elusive for the protection of that basic right. . . . Though we see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature." (*Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665].) ▮ "Also encompassed [within the right of freedom of speech] are amusement and entertainment as well as the exposition of ideas." (*Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 242 [49 Cal.Rptr. 537, 411 P.2d 289].)[3]

---

ment." In *Adams Theatre Co.* v. *Keenan* (1953) 12 N.J. 267, 270 [96 A.2d 519], the Supreme Court of New Jersey said: "The performance of a play or show, whether burlesque or other kind of theatre, is a form of speech and *prima facie* expression protected by the State and Federal Constitutions. . . ." (See also *Adams Newark Theatre Co.* v. *City of Newark* (1956) 22 N.J. 472, 475 [126 A.2d 340].)

[2]Indeed, the concepts of "potential" and prima facie First Amendment protection are becoming increasingly important in areas other than obscenity law. The restricted and literal approach to the definition of speech protected by the First Amendment is gradually being replaced by an emphasis on the interest in communication, whether or not promoted by conduct that is precisely speech. The protection of this interest depends upon a balancing process: the weighing of the interest of the state in suppressing or regulating the questioned conduct as against the opposing interest in the interchange of ideas. (Compare *Brown* v. *Louisiana* (1966) 383 U.S. 131 [15 L.Ed.2d 637, 86 S.Ct. 719] (opinion of Fortas, J.) with *Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476], and *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242]. See also *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 506-507 [55 Cal.Rptr. 401, 421 P.2d 409]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813].) California's obscenity law here at issue represents merely a particular, albeit well-established, example of this balancing of interests to determine whether First Amendment guarantees apply to a particular example of communication or whether sufficiently important state interests dictate a contrary result.

[3]Unquestionably, these cases provide First Amendment protection for communication that in fact exhibits no special relationship to the political process. Even to the extent that it is possible, for example, to isolate and enumerate precise opinions or concepts in a Joyce or Shakespeare, the ideas they espouse might well have little apparent relevance to the political process. Yet no one could doubt that these works warrant First Amendment protection.

One rationale for this result is that, although the First Amendment is designed to protect only communication that forms the basis for workable democracy in the exchange of ideas relevant to political decisions, "[t]he line between the informing and the entertaining is too elusive"

In light of this approach, the performance of the dance indubitably represents a medium of protected expression. To take but one example, the ballet obviously typifies a form of entertainment and expression that involves communication of ideas, impressions, and feelings. Similarly, Iser's dancing, however vulgar and tawdry in content, might well involve communication to her audience. In fact, the Attorney General basically argues that Iser's dance violated the statute because it communicated improper ideas to her audience. This implicit admission of the Attorney General undermines his preliminary contention that the dance does not enjoy at least a prima facie protection of the guarantees of the First Amendment. Precisely because, as the Attorney General points out, the performed dance primarily constitutes a form of expression and communication, it potentially merits First Amendment protections.

■ The prima facie applicability of the First Amendment to this medium of communication, the dance, does not fail merely because the particular form of its manifestation may be obnoxious to many persons. Although the Attorney General contends that "topless dancing," as performed in the instant case, cannot itself demonstrate any social value worthy of protection under the First Amendment, it is "as much entitled to the protection of free speech as the best of [dance]" (*Winters* v. *New York, supra,* 333 U.S. 507, 510 [92 L.Ed. 840, 847]). "The line . . . is too elusive" (*id.*) to allow for particularized judgments as to whether each individual example of expression possesses social values meriting First Amendment protection.

Of course a conclusion that Iser's theatrical dance prima facie gains a First Amendment protection does not affect the central question presented in this case: whether her perform-

(*Winters* v. *New York, supra,* 333 U.S. 507, 510 [92 L.Ed. 840, 847]) and courts must therefore cast a wide net over all forms of communication in order to protect that which is of potential political relevance. An equally persuasive rationale, however, is that the life of the imagination and intellect is of comparable import to the preservation of the political process; the First Amendment reaches beyond protection of citizen participation in, and ultimate control over, governmental affairs and protects in addition the interest in free interchange of ideas and impressions for their own sake, for whatever benefit the individual may gain. (Cf. Kalven, *The Metaphysics of the Law of Obscenity* (1960) Sup. Court Rev., p. 1.) In any event, the apparent lack of relevance of the dance here at issue to any political decisions is immaterial; under either rationale the dance potentially merits First Amendment protection. Thus the First Amendment cannot be constricted into a straitjacket of protection for political expression alone. Its embrace extends to all forms of communication, including the highest: the work of art.

ance loses this privileged status because it is obscene. (*Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304].) As the Court of Appeal in *Landau* v. *Fording* (1966) 245 Cal.App.2d 820, 823 [54 Cal.Rptr. 177], said as to the comparable medium of motion pictures, ''While motion pictures, like other forms of expression, are within the ambit of the constitutional guarantees of freedom of speech and of the press (*Joseph Burstyn, Inc.* v. *Wilson*, 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]), obscenity is not subject to those guarantees (*Roth* v. *United States*, 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304]).'' In short, the People's argument that, unlike other forms of dance, such as ballet, Iser's dance appeals to prurient interests, must turn on whether the performance was obscene, not on whether dance in general or ''topless'' dancing in particular can achieve constitutional protection.[4]

Nor can we accept the prosecution's sweeping argument that ''standards required of an obscenity prosecution are inapplicable in this case'' because the ''conduct standing alone is clearly unlawful'' and does not become lawful ''because it is engaged in during an activity'' which would be afforded First and Fourteenth Amendment protections. Petitioner's apparent ''unlawful conduct'' consisted of the baring of her breasts; the thrust of the argument presumably is that since such conduct could not be lawfully engaged in at any place and any time and under any and all circumstances it is not entitled to constitutional protection when performed in the different context of a theatrical performance.

The conduct here of course took place during a theatrical performance of a dance before an audience. We have previously explained that such a dance enjoys constitutional protection. The proper issue here therefore turns on whether

---

[4]Petitioners strongly argue that the language ''lewdly'' in Penal Code section 314, subdivision 1, and ''lewd or dissolute'' in Penal Code section 647, subdivision (a), is unconstitutionally vague. At least for the present purpose of determining the alleged obscenity of a dance performed before an audience for entertainment, we interpret, as did the trial court below, the terms ''lewd'' and ''dissolute'' as identical to ''obscene,'' a term that section 311 of the Penal Code defines with as much precision as legislatures and courts have been able to muster in this complex and confusing area. So interpreted, no vagueness objection to section 314, subdivision 1, or section 647, subdivision (a), is tenable. (*Mishkin* v. *New York* (1966) 383 U.S. 502, 506 [16 L.Ed.2d 56, 60, 86 S.Ct. 958].) At the same time, however, by making more specific the scope of section 314, subdivision 1, and section 647, subdivision (a), we necessarily involve ourselves in an issue of constitutional dimension: whether the prosecution has offered sufficient proof of each element of obscenity prescribed by section 311 of the Penal Code.

the alleged unlawful conduct, which is inextricably a part of the dance, forfeits constitutional protection because of its alleged obscene nature.

To isolate the questioned conduct and to judge it in an entirely different context would be to distort the nature of this case. By fictitiously changing the manner and place of its performance the prosecution would make the conduct criminal although in the actual manner and place of its performance the conduct should be tested by constitutional standards.

Thus acts which are unlawful in a different context, circumstance, or place, may be depicted or incorporated in a stage or screen presentation and come within the protection of the First Amendment, losing that protection only if found to be obscene. Respondent's contention would automatically reject the application of the law of obscenity to the instant case. It would adjudicate Iser's conduct as if it were not performed on the stage, not a dance, and not incorporated in a form of communication. Yet the entire point of the case is that the conduct occurred in that very context.

3. *Pursuant to section 311 of the Penal Code the People must prove that, applying contemporary community standards, the expression in question appealed to the prurient interest of the audience and so exceeded customary limits of candor as to be offensive.*

As we have explained, the trial judge, quoting Penal Code section 311, instructed the jury that "Obscene means that to the average person, applying contemporary standards, the *predominant appeal* of the matter, taken as a whole, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, *which goes substantially beyond customary limits of candor* in description or representation of such matters and is matter which is utterly without redeeming social importance." (Italics added.)

In approaching petitioners' contention that the prosecution's failure to introduce evidence of contemporary community standards constitutes reversible error, we face a preliminary question: do we apply the test of contemporary community standards to whether the predominant appeal of the matter is to "prurient interest" only or do we also apply it to whether the representation "goes substantially beyond customary limits of candor"? Clearly the Penal Code contemplates that the test of community standards applies to the question whether the *predominant appeal* of the material is to "prurient interest." The decision of the United States

Supreme Court in *Roth* v. *United States, supra*, 354 U.S. 476, from which the Penal Code language emanated, clearly contemplates that test. The *Roth* opinion expresses the issue to be "whether . . . , applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." (*Id.* at p. 489 [1 L.Ed.2d at p. 1509].) Thus the *Roth* decision, in addition to the explicit textual connection in section 311 between "prurient interest" and "contemporary community standards," requires that the prurient interest of Iser's dance be judged by contemporary community standards.

The more difficult question turns on whether the reference in the section to "customary limits of candor" also contemplates a test by community standards. Although *Roth* did not list such a requirement, and the language of the Penal Code is at best ambiguous, recent decisions by the United States Supreme Court suggest an affirmative answer. In *Memoirs* v. *Massachusetts* (1966) 383 U.S. 413, 418 [16 L.Ed.2d 1, 5, 86 S.Ct. 975] a plurality opinion (Brennan and Fortas, JJ., and Warren, C. J.) modified the *Roth* test as follows: "Under this [*Roth*] definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) *the material is patently offensive because it affronts contemporary community standards* relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."[5] (Italics added.) (See also *Redrup* v. *New York* (1967) 386 U.S. 767, 770-771 [18 L.Ed.2d 515, 517-518, 87 S.Ct. 1414].) Moreover, Justices Harlan and Stewart, announcing the judgment of the court in *Manual Enterprises* v. *Day* (1962) 370 U.S. 478 [8 L.Ed.2d 639, 82 S.Ct. 1432] presaged part (b) of the reassessment articulated in *Memoirs* by reversing a finding of obscenity because the materials were not "so offensive . . . as to affront current community standards of decency." (*Id.* at p. 482 [8 L.Ed.2d at p. 644].)

In sum, a majority of the United States Supreme Court have apparently concluded that a finding of offensiveness to the accepted community standards of decency forms a pre-

---

[5] Petitioners do not so much as claim that their convictions should be set aside on the ground of the "redeeming social value" of Iser's dance. Thus we do not reach the problem of whether the dance was "utterly without redeeming social value" and we certainly do not hold that it met that test.

requisite to a conclusion of obscenity. In order to conform to the Supreme Court decisions and to avoid questions of constitutionality, we interpret the words "customary limits of candor," as used in section 311 of the Penal Code, to require a showing that the material so exceeds customary limits of candor as to affront contemporary community standards of decency.

4. *The convictions must be set aside because the People failed to introduce proof of contemporary community standards.*

Having thus established a definition of obscenity, we face the question whether the People sufficiently proved all of its elements to support a conviction. We conclude the convictions must be set aside because the prosecution failed to introduce any evidence of community standards, either that Iser's conduct appealed to prurient interest or offended contemporary standards of decency.

We note at the outset the conflict of the authorities on the manner of proof of community standards. Some cases have held that the issue of obscenity can be resolved from the material or conduct itself without expert testimony or other evidence relevant to contemporary community standards. (E.g., *City of Newark* v. *Humphres* (1967) 94 N.J.Super. 384, 390-391 [228 A.2d 550]; *City of Chicago* v. *Kimmel* (1964) 31 Ill.2d 202, 206 [201 N.E.2d 386]; *Kahm* v. *United States* (5th Cir. 1962) 300 F.2d 78, 84-85, cert. den., 369 U.S. 859 [8 L.Ed.2d 18, 82 S.Ct. 949].) Others have held that in the absence of a showing by expert testimony that the questioned expression or conduct affronted the standards of the community, proof of obscenity failed. (*Dunn* v. *Maryland State Board of Censors* (1965) 240 Md. 249, 257 [213 A.2d 751]; *United States* v. *Klaw* (2d Cir. 1965) 350 F.2d 155, 167.)[6]

Relying principally on the well established doctrine that jurors should not be endowed with the prerogative of imposing their own personal standards as the test of criminality of conduct, we hold that expert testimony should be introduced to establish community standards. We cannot assume that jurors in themselves necessarily express or reflect community standards; we must achieve so far as possible the application of an objective, rather than a subjective, determination of

---

[6]For a more complete list of authorities, see Comment, *Expert Testimony in Obscenity Cases* (1966) 18 Hastings L.J. 161, 170 fns. 61, 62, and 174 fn. 79.

community standards.[7] An even-handed application of the criminal law, even with evidentiary guidance (cf. *In re Newbern* (1960) 53 Cal.2d 786, 797 [3 Cal.Rptr. 364, 350 P.2d 116]), is sufficiently difficult in an area so confusing and intricate as obscenity. To sanction convictions without expert evidence of community standards encourages the jury to condemn as obscene such conduct or material as is personally distasteful or offensive to the particular juror. (Cf. *United States* v. *Klaw, supra,* 350 F.2d 155, 167.) "[C]ommunity standards . . . can . . . hardly be established except through experts. . . . There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges . . . . Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge. It bears repetition that the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experience of life, but on the basis of 'contemporary community standards.' " (*Smith* v. *California* (1959) 361 U.S. 147, 165 [4 L.Ed.2d 205, 218, 80 S.Ct. 215] (Frankfurter, J., concurring).)[8]

[7]In fact we rejected, in another context, final determination of obscenity by subjective reaction of the jury in *Zeitlin* v. *Arnebergh* (1963) 59 Cal.2d 901 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707]. Responding to the contention that independent appellate review of the alleged obscenity of material is inappropriate because *Roth* focuses the test of obscenity on community standards and the jury by definition represents the community, this court said: " [W]e do not believe that the definition of 'obscene' material as that which 'to the *average person* . . . predominant appeal . . . is to prurient interest . . . ' . . . indicates that the ultimate determination of that question is always for the jury. These words fix a *standard* which is to be applied to the material; they do not designate the body which is to apply the standard. The statutory language does not inherently predicate a question for the jury; it merely frames a definition." (*Id.* at p. 911.) Similarly, in the instant case formulation of the obscenity test in terms of community standards does not suggest a ruling that the jury can reach a subjective judgment on the definition of the standard; the emphasis on the concept of "community" necessarily indicates the requirement for an objective standard.

[8]Some courts that, as a general rule, require proof of community standards have held that an expression can be so patently obscene as to obviate that requirement (e.g., *Womack* v. *United States* (1961) 294 F.2d 204, 206 [111 App D.C. 8], cert. den., 365 U.S. 859 [5 L.Ed.2d 822, 81 S.Ct. 826]). In the instant case, however, we need not decide whether to adopt this exception in California. In brief, this case involves a "topless" dance shown only to adults (cf. *Ginsberg* v. *New York* (1968) 390 U.S. 629 [20 L.Ed.2d 195, 88 S.Ct. 1274]) who knew exactly what

Moreover, since we designate the State of California as the relevant "community" for this case, we cannot realistically expect the trier of fact to understand intuitively how the community as a whole would react to allegedly obscene material. "Knowledge of contemporary community standards . . . is no more available to the trier of facts than the innumerable other facts which must normally be proved in an evidentiary way in many other trials." (*Hudson* v. *United States, supra,* 234 A.2d 903.) The use of "contemporary community standards" as part of the constitutional test for obscenity does not in any way indicate that a jury inevitably can accurately apply this standard without guidance; rather, the "community standard" of the entire State of California is an ascertainable, albeit ephemeral, phenomenon subject to evidentiary proof to a jury selected from a local area, just as is any other question of fact.[9]

Finally, even if the jury should be deemed to be a metaphysical embodiment of the "community," and therefore intrinsically cognizant of community standards, proof of community standards would nevertheless be indispensable to effective appellate review. An appellate court must reach an independent decision as to the obscenity of the material. (*Zeitlin* v. *Arnebergh, supra,* 59 Cal.2d 901, 908-909.) Since an appellate court certainly does not in any sense compose a cross-section of the community, it cannot effectively carry out this function in the absence of evidence in the record directed toward proof of the community standard.[10]

---

they were going to see. Since this conduct is not so patently offensive as to violate any conceivable community standard, we need not decide whether evidence of community standards must be introduced in an extreme and unquestionable situation.

[9]Although we do not minimize the difficulty in finding qualified experts for such purpose, most commentators and courts have concluded that this problem does not raise an insurmountable barrier. (Comment, *Expert Testimony in Obscenity Cases* (1966) 18 Hastings L.J. 161; Note, *The Use of Expert Testimony in Obscenity Litigation,* 1965 Wis.L.Rev. 113; *United States* v. *Klaw, supra,* 350 F.2d 155; *United States* v. *One Carton Positive Motion Picture Film Entitled "491"* (S.D.N.Y. 1965) 247 F.Supp. 450; *Trans-Lux Distributing Corp.* v. *Maryland State Board of Censors* (1965) 240 Md. 98 [213 A.2d 235].)

[10]The only other justification sometimes offered for a holding that the prosecution need not introduce evidence of community standards rests upon an analogy to the jury's function in cases involving a determination of negligence. In a negligent homicide case, for example, the jury divines the conduct of a reasonably prudent man without expert testimony or other evidentiary assistance and then applies this standard to the proven facts. Some courts conclude from this practice that a jury also should be allowed to apply the obscenity test without proof of community standards. (E.g., *Kahm* v. *United States, supra,* 300 F.2d 78, 84.)

We conclude that the judgment must be vacated for lack of evidence as to whether, applying contemporary community standards, petitioner Iser's dance appealed to the prurient interests of the audience and offended accepted standards of decency.[11] "If there is no evidence in the record upon which such a finding could be made, obviously the material involved cannot be held obscene." (*Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 202 [12 L.Ed.2d 793, 806] (Warren, C. J., dissenting).) Anything to the contrary in *People* v. *Williamson* (1962) 207 Cal.App.2d 839, 847 [24 Cal.Rptr. 734], is disapproved.

5. ■ *For purposes of determining the obscenity of the performed dance here in question, the relevant "community" is the entire State of California.*

Since we have held that the failure by the People to introduce evidence of community standards nullifies the judgment in any event, we need not technically reach the issue of the definition of the nature of the community that should measure petitioners' conduct. In order to provide guidance in the

---

The analogy fails primarily for practical reasons. "Community standards" are a complex compendium of attitudes and practices pervading the geographical entity serving as the relevant "community"—in this case, the State of California. (See p. 577, *infra.*) A locally selected jury, without evidentiary guidance, cannot realistically be expected to appreciate this interplay sufficiently to render an accurate verdict, especially when the issue at stake is the crucial one of defining criminal conduct. (Cf. *United States* v. *Davis* (2d Cir. 1965) 353 F.2d 614, 617 (Waterman, J., dissenting).) In contrast, the jury, from their collective experience, are more likely to understand and appreciate the considerations relevant to an evaluation of how a reasonable man would act in given circumstances. That determination involves the finding of whether past conduct conformed to the historical standard of the common law. It does not embrace questions of empirical fact, such as the attitude or reaction of a geographical "community" not necessarily represented by a jury panel.

[11]Although numerous cases have held that sufficiency of the evidence to support a conviction is not a proper issue on habeas corpus. (*In re Manchester* (1949) 33 Cal.2d 740, 744 [204 P.2d 881]; *In re Lindley* (1947) 29 Cal.2d 709, 723 [177 P.2d 918]), the United States Supreme Court has declared that conviction of a crime without any evidence in the record to support the accused's guilt constitutes a denial of due process. (*Garner* v. *Louisiana* (1961) 368 U.S. 157, 173-174 [7 L.Ed.2d 207, 219-220, 82 S.Ct. 248]; *Thompson* v. *City of Louisville* (1960) 362 U.S. 199, 204, 206 [4 L.Ed.2d 654, 658, 659, 80 S.Ct. 624, 80 A.L.R.2d 1355].) Since the present record contains no evidence as to contemporary community standards, a crucial element in the proof of guilt, the conviction of petitioners violated due process. Hence, habeas corpus is available. (*In re Harris* (1961) 56 Cal.2d 879, 880 [16 Cal.Rptr. 889, 366 P.2d 305]; *In re Johnson* (1965) 62 Cal.2d 325 [42 Cal. Rptr. 228, 398 P.2d 420]; *In re Waltreus* (1965) 62 Cal.2d 218, 221 [42 Cal.Rptr. 9, 397 P.2d 1001].)

event of further prosecutions, however, we hold that the trial judge correctly ruled that the relevant community is the State of California.

Four justices of the United States Supreme Court have pondered the question whether the First and Fourteenth Amendments require the use of a "national community" in determining whether a work is obscene, and they have split evenly on the issue: "Justices Brennan and Goldberg have contended that a national standard is constitutionally compelled (*Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 192-194 [12 L.Ed.2d 793, 800-801]), but Chief Justice Warren and Justice Clark have reached the opposite conclusion (*id.* at p. 200 [12 L.Ed.2d at p. 805]). In the absence of guidance from the Supreme Court, lower courts are divided: the cases support at least three standards—national (*State* v. *Hudson County News Co.* (1963) 41 N.J. 247, 265 [196 A.2d 225]; *Excellent Publications, Inc.* v. *United States* (1st Cir. 1962) 309 F.2d 362, 365 (dictum)), state (*McCauley* v. *Tropic of Cancer* (1963) 20 Wis.2d 134, 149 [121 N.W.2d 545, 5 A.L.R. 3d 1140]), and "local" or citywide (*Gent* v. *State* (1965) 239 Ark. 474 [393 S.W.2d 219] reversed on other grounds *sub nom. Redrup* v. *New York, supra,* 386 U.S. 767).

The principal deficiency of the national standard lies in the fact that its application may well be almost unworkable in light of our holding that the People must introduce evidence relating to the standard in the chosen "community." Even if some modicum of uniformity of attitudes toward "topless" dancing pervades the entire nation, a proposition in itself doubtful, trial courts would be hard pressed, without substantially diluting the normal requirements for qualification as an expert witness, to find persons with the ability to testify knowledgeably as to that standard. (Cf. *Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 200 [12 L.Ed.2d 793, 805] (Warren, C.J., dissenting); *Ginzburg* v. *United States* (1966) 383 U.S. 463, 480 [16 L.Ed.2d 31, 43, 86 S.Ct. 942] (Black, J., dissenting).)

Nor do any theoretical propositions grounded in the First Amendment press for a national standard. Although the application of diverse local standards to test the constitutionality of permissible "political" speech would certainly be subject to question, the law of obscenity represents simply the "present critical point in the compromise between candor and shame at which the community may have arrived here and now." (*United States* v. *Kennerley* (S.D.N.Y. 1913) 209 F. 119, 121 (Hand, J.).) Indeed, this compromise is inherent in

elements of current definitions of obscenity, including "customary limits of candor" (*Jacobellis* v. *Ohio, supra,* 378 U.S. 184; Pen. Code, § 311) and "patent offensiveness" (*Manual Enterprises* v. *Day, supra,* 370 U.S. 478, 482 [8 L.Ed.2d 639, 643]). Different areas of the country, both in attitude and practice, undoubtedly do reach different compromises between "candor and shame," and we can conjure no reason for ignoring so obvious a reality. Certainly, all would agree that standards of obscenity are not immutable; they change with the character of whatever community we use for a testing ground. If we recognize and apply different standards based upon the particular time that we test the conduct or material, we should not be disturbed by different standards based upon the place of the test; geography should assume a no more troublesome role than chronology.[12]

The strongest argument in support of a national community, that a non-national standard would produce the "intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency" (*Manual Enterprises* v. *Day, supra,* 370 U.S. 478, 488 [8 L..Ed.2d 639, 647]), does not apply with any force to the instant fact situation. Evaluation of "speech" that is designed for nationwide dissemination, such as books or films, according to a non-national community standard might well unduly deter expression in the first instance and thus run afoul of First Amendment guarantees. But we need not, in the instant case, reconcile this contention with the practical problems of producing evidence of national standards. Iser's dancing is purely local in nature, a subject matter obviously not intended for nationwide dissemination. Since the decision as to whether to stage a "topless" dance rests solely on local considerations, the problem that unduly restrictive local standards may interfere with dissemination of and "access to [such] material" as books or film does not arise in the instant case.

---

[12]Some jurists have urged that communities differ in many respects other than toleration of alleged obscenity; yet these differences have not justified diverse standards with respect to application of constitutional guarantees such as those in criminal procedure. (See, e.g., *Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 194 [12 L.Ed.2d 793, 801] (opinion of Brennan, J.).) Constitutional standards of criminal procedures, however, do not, at least explicitly, take into account "community" standards. The law of obscenity, on the other hand, by definition reflects a balancing of candor and shame in the community, and it is thus quite pertinent to inquire which community's attitudes should be the touchstone of decision.

With the alternative of using a national community eliminated, the choice lies between a statewide standard and some variant of a local community. It might be argued that the same theoretical considerations that induce a rejection of a national standard also apply to a statewide test. In particular, the compromise between "shame" and "candor" might vary within California from area to area. Moreover, the smaller the community chosen, the more likely it is that competent evidence of community standards will be available. Finally, if in the present case the prohibition mainly presumes both to protect the audience from its own alleged baseness and the local community from anticipated antisocial conduct arising from observance of the dance, as well as to save the local citizenry from toleration of the objectionable conduct, then the standard should be local. It should comprise either the area from which the audience is likely to be drawn or the area in which the citizenry may be affected by the proscribed dance.

Although these considerations are not *de minimis,* we conclude that on balance a community comprised of the entire State of California is the more appropriate. This standard avoids administrative problems in determining the exact scope of a smaller community: whether it should be city, county, individual neighborhood within a city, or whatever. Moreover, a strong policy favors uniformity in application of the state criminal law (cf. *In re Lane* (1962) 58 Cal.2d 99, 111 [22 Cal.Rptr. 857, 372 P.2d 897] (Gibson, C.J., concurring)); we promote this policy by assuring that application of the obscenity law in this state will be based on a uniform "community."

The writ is granted. The judgments against Giannini and Iser are set aside. They are remanded to the custody of the San Pablo Municipal Court for further proceedings, if any.

Traynor, C. J., Peters, J., Mosk, J., and Sullivan, J., concurred.

BURKE, J.—I dissent. I disagree with the majority that the prosecution was required to introduce expert testimony establishing contemporary community standards and that the relevant community in this case should be the entire State of California rather than the local community. No decision of the United States Supreme Court nor any statute cited by the majority compels the adoption of either rule. It is manifest that the majority's new rules will impose a difficult or impos-

sible burden on local communities in combating obscenity. They will lead to a further lessening of local control over local affairs—a further removal of the power of self-government from the local citizenry and their duly elected and selected, responsible local officials—and inevitably, a deplorable lowering of standards in many local communities to conform to lower standards elsewhere.

Mr. Justice Potter Stewart, concurring in *Jacobellis* v. *Ohio*, 378 U.S. 184 [12 L.Ed.2d 793, 84 S.Ct. 1676] noted that hard-core pornography is hard to define but that ''I know it when I see it. . . .'' (P. 197 [12 L.Ed.2d p. 803].) And the same can be said of lewd or dissolute conduct. Here, the police officers of the small City of San Pablo thought they saw such conduct in petitioner Iser's performance; they described it to the jury from the witness stand. The jury found petitioners guilty, and on appeal the judgment was affirmed. That should have ended the controversy.

The testimony of the police officers at petitioners' trial is in my opinion amply sufficient to support the conviction. The majority conclude otherwise on the basis of their newly adopted rule that the prosecution must introduce expert testimony establishing contemporary community standards. Why is such testimony required? Because, assert the majority, ''To sanction convictions without expert evidence of community standards encourages the jury to condemn as obscene such conduct or material as is personally distasteful or offensive to the particular juror.'' (*Ante,* p. 575.) ''Moreover,'' state the majority, ''since we designate the State of California as the relevant 'community' for this case, we cannot realistically expect the trier of fact to understand intuitively how the community as a whole would react to allegedly obscene material.''[1] (*Ante,* p. 576.) And further, declare the majority, expert testimony of community standards is indispensable to effective appellate review.

These reasons are not persuasive. I agree with decisions which have expressly or impliedly concluded that a jury,

---

[1] Here the trial court in instructing the jury regarding obscenity stated in part that the ''standards which you must apply . . . are the standards of the community, and *the smallest community which you may consider is the State of California.*'' (Italics added.) Although in my view the italicized statement is erroneous, petitioners do not now complain of the error. In any event, the error was or could have been raised on appeal, and habeas corpus ordinarily cannot serve as a second appeal. (*In re Waltreus,* 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001]; *In re Winchester,* 53 Cal.2d 528, 532 [2 Cal.Rptr. 296, 348 P.2d 904].)

582

properly instructed, or trial judge, is fully capable of determining whether conduct or material appeals to prurient interest and offends contemporary community standards, without expert testimony on the subject, and that such testimony is not essential to appellate review. (*Kahm* v. *United States,* 300 F.2d 78, 84; *People* v. *Pinkus,* 256 Cal.App.2d Supp. 941, 946-947 [63 Cal.Rptr. 680] ; *State* v. *Onorato,* 3 Conn. Cir. 438 [216 A.2d 859, 860] ; *City of Chicago* v. *Kimmel,* 3 Ill.2d 202 [201 N.E.2d 386, 388].) And, as we shall see, a state standard is wholly inappropriate for judging obscenity of a local public performance such as the one in question.

Surely this court's laudable concern with the preservation of essential liberty of expression should not blind the court to the practicalities of what it is now requiring be done as a prerequisite to curtailing the spread of obscenity in California. As a result of the majority opinion, local entities of government in prosecuting what were formerly regarded as ordinary justice or municipal court lewd or dissolute conduct cases will now be faced with the difficult or impossible task of introducing expert testimony establishing a state standard. The majority state that ''the 'community standard' of the entire State of California is an ascertainable, albeit ephemeral, phenomenon subject to evidentiary proof'' *ante,* p. 576), but the majority fail to offer any enlightenment as to how the so-called state standard is to be ascertained.

Would the toleration by a few metropolitan areas of ''topless'' gyrations of the type here in question establish the state standard for the more than 9,000 other cities and communities in California? If such isolated instances of unbridled license are to be the pacemakers for all communities in the state the result can only be a colossal and catastrophic lowering of standards throughout the state. Or if most California cities and communities do not permit such performances, does this establish the state standard? Or would one strive to strike an average in determining the state standard? If 100 communities have ''topless'' as against 9,000 that do not, then is 1/90th ''topless'' to be the state standard? Chief Justice Warren and Justice Clark have expressed the belief that there is no provable ''national standard'' (see *Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 200 [12 L.Ed.2d 793, 805] [dissent]),[2]

---

[2] In *Jacobellis* v. *Ohio, supra,* 378 U.S. 184, 192-194 [12 L.Ed.2d 793, 800-801], Justices Brennan and Goldberg concluded that a national standard should be applied, but the issue was not decided by a court majority.

and I similarly doubt that there is any provable state standard.

But even if there is such a standard, the same considerations that lead the majority to reject a national standard require the application of a local rather than state standard. The majority, in rejecting a national standard, state, "[T]he law of obscenity represents simply the 'present critical point in the compromise between candor and shame at which the community may have arrived here and now.' . . . Different areas of the country, both in attitude and practice, undoubtedly do reach different compromises between 'candor and shame,' and we can conjure no reason for ignoring so obvious a reality. Certainly, all would agree that standards of obscenity are not immutable; they change with the character of whatever community we use for a testing ground." (*Ante,* p. 578-579.) The majority further point out that the strongest argument against a non-national standard, namely that it would result in denying some sections of the country access to material, there deemed acceptable, that elsewhere might offend prevailing community standards, does not apply with any force here, since petitioner Iser's dancing is "purely local in nature, a subject matter obviously not intended for nationwide dissemination." (*Ante,* p. 579.) Patently, neither is her dancing intended for statewide viewing.

The majority also reject a national standard on the basis of the difficulty of obtaining qualified experts to testify regarding such a standard. A similar difficulty will exist in obtaining qualified experts to testify regarding a state standard.

It seems obvious that the imposition of such a burden in obscenity cases will result in increased permissiveness and a consequent downward trend of standards in this state. Also, as a result of the majority opinion, the high standards of many communities throughout this state will be forced downward to meet a lower level.

The only reasons advanced by the majority for concluding that a state standard is "more appropriate" are that it avoids administrative problems in determining the exact scope of a smaller community and that "a strong policy favors uniformity in application of the state criminal law. . . ." (*Ante,* p. 580.) However, any such "administrative problem" is *de minimis* compared with the problem imposed by the majority upon local governmental entities of ascertaining

a state standard and finding qualified experts to testify to it. In my opinion the controlling policy here should be to allow local communities the maximum control possible over local activities. If we deny this reasonable measure of local control, inevitably this court will have to bear its share of the weighty burden of having removed one of the last remaining barriers to the spread of obscenity into our residential communities.

I would discharge the order to show cause and deny the petition.

McComb, J., concurred.

Respondent's petition for a rehearing was denied December 11, 1968. McComb, J., Mosk, J., and Burke, J., were of the opinion that the petition should be granted.